\* ARCHIBALD E. CONSTANT, Appellant, *v.* JOEL A. MATTESON *et al.,* Appellees.

### ERROR TO SANGAMON.

To give a creditor the right to be substituted, in the place of the surety of his debtor, the relation of debtor and creditor must exist between the creditor and the surety. The claim on the surety must be valid, binding, and capable of being immediately enforced.

If the relation of creditor and debtor has never existed between a creditor and the surety, or having existed, has ceased, there cannot be any substitution to the rights of a surety.

If a surety is liable for the immediate payment of a debt, owing by his principal, he may pay it and resort at once to any funds of the principal, he holds as an indemnity, without waiting for the money to be collected by a resort to an action at law.

In chancery, if the creditor applies to be subrogated to the rights of a surety, the fund pledged to indemnify the surety, will be directly appropriated to the payment of the debt for which the surety is liable, if the surety has the immediate right to satisfy the debt and resort to the indemnity in his hands.

If property is conveyed to a trustee for the payment of a debt, if the trustee fails so to apply it, a court will compel its application to that purpose.

Where a debtor gives his surety a mortgage to indemnify him against loss, the property mortgaged can only be applied, when the surety has either paid the debt or has become immediately liable for its payment, and until then, a court of equity will not interfere.

Possession of mortgaged chattels, by the mortgagor, is fraudulent as to creditors and purchasers, unless such possession is provided for by the mortgage. After the time for possession by the debtor has passed, if he keeps the property, it is equally fraudulent, and subsequent liens or purchasers will be preferred to such prior mortgagee.

If there are several mortgages, all over due, and the mortgagor holds the property contrary to the conditions of them, any mortgagee who first takes possession of the property, acquires a preference over the others, without regard to the date of the mortgage.

Upon the forfeiture of the condition of the mortgage, the legal title vests in the mortgagee, and becomes complete in time, if he takes possession.

A trustee, without a stipulation to that effect, cannot claim compensation for his services, but may claim for necessary expenditures in preservation or management of the trust property.

A solicitor's fee cannot be taxed as costs in a case. The discretion of a court of chancery in awarding costs, must be confined to statutory allowances.

ABOUT the month of July, 1857, Miller and Scott, doing business as partners, in St. Louis, Missouri, filed two bills in the Circuit Court of Sangamon county. One against Thomas D. Wickersham and Joel A. Matteson, and the other against Thomas D. Wickersham and Archibald E. Constant, respectively alleging in each: That on or about the 29th day of October, 1856, they sold to Thomas D. Wickersham, a bill of goods, wares and merchandise, for the purpose of furnishing and fitting up a hotel, in the city

---

\* This cause was argued at January Term, 1859, in the 2nd Grand Division.

of Springfield, known as the St. Nicholas Hotel. The bill amounted to $1,505.26. That Wickersham being unknown to them, they required security for the same ; that thereupon, said Wickersham procured the indorsement of his note by Joel A. Matteson, for $752.63, being for one-half the bill, and executed another note for the same amount, to which the signature of Archibald E. Constant was obtained as surety for the other half of said bill. The notes were dated December 1st, 1856, and payable in six months after date. Bill further alleges that Matteson and Constant, respectively took mortgages on all the stock, furniture, etc., of the St. Nicholas House, for their indemnity against this liability as well as other liabilities they had incurred for said Wickersham.

These mortgages were separate to each.

Bills further allege, that about two months after the above transaction, said Wickersham desiring additional goods of complainants, purchased another bill amounting to three or four hundred dollars, with the understanding, that he was also to give security for this additional bill, and that new securities should be given, including both bills. That confiding in this understanding, said complainants cancelled the notes for the first bill of goods and delivered them up to Wickersham, with the understanding that he was to send them new securities for the whole bill. That subsequently, Wickersham sent to complainants, bills drawn upon Matteson and Constant respectively, for one-half of the whole bill, amounting to $925.73 each, which were afterwards severally protested for non-acceptance on the part of Constant and Matteson. Complainants offer to file or deliver up said drafts. Bills pray that either Constant and Matteson may be decreed to execute new notes to complainants for the amount of their original notes, or that complainants may be substituted or subrogated to the place and rights of Matteson and Constant respectively under their mortgages on Wickersham, and for general relief.

The answers of Constant and Matteson severally, to the bills so filed against them, set forth and admit : That they did execute or indorse notes for Wickersham to complainants as described in complainants' bills ; set forth that they are informed and believe complainants refused to receive and accept the said notes when they were sent to them, and that they cancelled and returned them to Wickersham ; admit the execution of a mortgage to them respectively, for their indemnity against these and other liabilities they had assumed as securities for said Wickersham ; that they knew nothing of any subsequent purchase of goods from complainants by Wickersham ; were not parties nor consenting to any arrangement then made ; admit that subsequently

drafts were presented to them for accceptance, to Messrs Miller and Scott, for larger amounts than the amount of their original notes, which they refused to accept or pay ; that after learning of the cancellation and delivering up to Wickersham of their original notes, (being only sureties thereon,) they supposed themselves released and absolved from all further liability thereon, and still so insist.

Constant in his answer sets out the additional fact, that supposing himself released from liability upon his said note to complainants, he had advanced further sums for said Wickersham, and had taken a further chattel mortgage upon the same property covered by the original mortgages to himself and Matteson, which he would not have done had he supposed the property liable for complainants' debt.

Replications were thereto filed by complainants.

Wickersham did not answer.

On the 18th of August, 1857, Joel A. Matteson filed his cross-bill in the cause in which he and Wickersham were defendants, alleging the same facts substantially, set forth in his answer in regard to the making of the notes by Wickersham and himself, and Constant and Wickersham to the complainants, and the taking of the mortgages before referred to, setting forth the surrender and cancellation of the notes by the complainants, and also setting forth the additional facts, that the mortgages referred to as executed to himself and said Constant respectively, were for their indemnity against two other claims, upon which they were either securities or indorsers for said Wickersham, said debts being of equal amounts in each mortgage—one being $1,303.50 and the other for the sum of $1,044.50, making the amounts secured by each mortgage $2,248, and the sum of both $4,496, besides the claim of said complainants. The mortgages to said Matteson and said Constant are described as having been executed at the same time and upon the same property (the goods and furniture of the St. Nicholas Hotel), and the debts to indemnify against which they were taken, matured at the same time, under each mortgage.

Reference is made in the cross-bill to the mortgages executed by Wickersham to himself (Matteson) and to Constant, which are made exhibits.

The condition in Matteson's mortgage is as follows :

" Provided, nevertheless, that whereas on the 12th day of December, 1856, I, the said Thomas D. Wickersham, executed to the said Joel A. Matteson, my certain promissory note for the sum of $1,203.50, payable five months after date, and also on the 1st day of December, 1856, I executed to said Joel A. Matteson, my other note of that date for the sum of $752.63,

due six months after its date, and also on the said first day of December, 1856, I executed to said Joel A. Matteson, my other note of that date for one thousand and four and twelve hundredths dollars, due four months after date. Now, should I pay said notes, and each of them, according to their tenor and effect, then this mortgage is void, otherwise to remain in full force and effect."

Mortgage further provides, that until default, Wickersham is to retain possession, etc. The note described as $752.63, was the same indorsed by Matteson to Miller and Scott, and the other two were indorsed by him to other creditors of said Wickersham.

The mortgage referred to as executed to Constant provides, and was conditioned for the payment of three several notes, corresponding in amounts and dates, and payable at the same time as the debts specified in Matteson's mortgage. One of the notes described being the note to Miller and Scott, for $752.63, executed by Wickersham and Constant.

Cross-bill further states, that on the 23d day of February, 1857, said Wickersham executed a mortgage to Richard V. Dodge, on a portion of the property of the St. Nicholas House not included or covered in the two mortgages before described. This mortgage was to secure Dodge from liability as surety for Wickersham on a note for $1,000, due on 1st July, 1857. Same conditions as the other mortgages in regard to retaining possession until default.

Cross-bill further states, that on the 9th day of March, 1857, Wickersham executed a further mortgage on the same property covered by the former mortgages, to McCabe and Vanness, to secure payment to them of a note due sixty days after date, for $1,100. Conditions as to retaining possession, same as the others.

Cross-bill further states, that on the 6th day of June, 1857, said Wickersham executed to Archibald E. Constant, another mortgage on the same property, to secure the sum of $1,700, as therein provided, with the same conditions as the former as to retaining possession.

Further recites, that on the 27th day of June, 1857, said Wickersham executed a further mortgage on said property, covered by the former mortgages, to Russel and Parsons, to secure a note for $600, due six months after the date of said mortgage. Conditions as to retaining possession the same as the others.

Cross-bill further states, that an execution is in the hands of the sheriff of Sangamon on a judgment of the Cook county Circuit Court, for $1,600, in favor of Charles Dunn, against said

Wickersham; also, that Matteson, Constant and Dodge have executions in the hands of said sheriff for the amount of their respective claims on Wickersham.

All the mortgages aforesaid contained the provisions (amongst others), that upon default, or whenever the respective mortgagees deemed the further possession of the property hazardous by said Wickersham, they should have the right to take possession.

The cross-bill further sets forth, that Wickersham having failed to pay the several sums for which said Matteson and said Constant were respectively liable for him, and to save them harmless therefrom, as provided in their first two mortgages, and having failed to pay the debt for the security of which the mortgage to R. V. Dodge was executed, in pursuance of the powers reserved in their respective mortgages, the said Matteson, the said Constant and the said Dodge, by agreement amongst themselves, took possession of said mortgaged property under their said mortgages—that said property was advertised for sale under said mortgages, and was sold at public auction, the said Matteson becoming the purchaser, with the understanding, as alleged, that he should bid off said property in his own name for the mutual benefit of said Dodge, said Constant and himself.

Cross-bill further states, that he (Matteson) is unable to set forth the exact liability of said Wickersham to him under said mortgage, as he is indebted to said Wickersham for board, which will to some extent diminish Wickersham's liability to him.

Cross-bill further sets forth, that after paying himself, (Matteson,) said Constant and said Dodge, out of said fund realized from said sale, there will be a balance for distribution—that there are conflicting claims thereto, and asks the assistance of the court in the premises. States that he is willing, and offers to bring the fund into court, etc., and prays the direction of the court as to its distribution. Constant, Dodge, McCabe and Vanness, Russel and Parsons, Dunn and Wickersham, are made parties to the cross-bill, and are required to answer.

Constant filed his answer to the cross-bill, admitting the allegations of the cross-bill as to the groundless and invalid character of the claim set up by Miller and Scott, and denying that said Miller and Scott have any claim on the mortgaged property, admits the allegations of the cross-bill as to the executions of the mortgages to himself, said Matteson, Dodge, McCabe and Vanness, and Russel and Parsons.

Admits allegations of the cross-bill, of acting in conjunction with Matteson and Dodge in taking possession of and selling the mortgaged property, alleging that default had been made by

said Wickersham under his first mortgage, and that his second mortgage was a subsisting *lien* upon the property. The condition of the second mortgage referred to, was as follows:

" Whereas, the said Constant has this day paid the Banking House of N. H. Ridgely, the sum of seven hundred dollars to discharge a note made by said Wickersham, with one Freeman as security, and to repay the said Constant for the money so advanced, the said Wickersham has executed to the said Constant his seven promissory notes of even date herewith, each for the sum of one hundred dollars, payable to said Constant, and due in one, two, three, four, five, six and seven months, with interest at ten per cent. per annum. Also, one other note, executed by said Wickersham to said Constant, for the sum of one thousand and sixty-one dollars and ninety-five cents, payable on demand with interest from date until paid, at ten per cent. per annum." Provision for retaining possession until default, as in former mortgages.

Dodge, McCabe and Vanness, and Russel and Parsons answer, setting up their respective claims under their mortgages. Dunn answers, setting forth his judgment and execution against Wickersham, and states that his execution had been levied upon the interest of Wickersham in a lease of the St. Nicholas Hotel.

On the 27th of May, 1858, Matteson amended his cross-bill, setting forth that he bid off the property in pursuance of an understanding between himself and Dodge and Constant, that he bid off the property in his own name for their mutual benefit, and that he afterwards sold the same property to one Fenner Aldrich, and had received therefor, the notes of said Aldrich for $7,489.70, payable with ten per cent. interest, as follows: $2,000 payable in fifteen months, and three notes for $1,829.90, each payable 1st days of July, 1858, '59 and '60, of date, 1st September, 1857. Notes secured by mortgage. Further sets up, that he expended a large sum in taking care of the mortgaged property, and other sums in discharging prior *liens* upon it, and prays that an account be taken of the same.

On the 17th of November, 1858, said Matteson further amended his bill, charging that he had been at great expense in selling said property and great risks had been incurred, and asks compensation therefor, also prays that the notes received by him for the property should be received by the defendants.

Constant filed his answer to the amended cross-bill of Matteson, denying the allegations of the amended bill. Sets forth that Matteson sold the property after it was bid off by him to Aldrich without consulting the other parties interested, and without their consent, and charges that Matteson should account for the proceeds in cash.

Replications having been filed to the answers, the cause was referred to the master for a report of the evidence, and for stating the accounts and demands of the parties.

At the August term of the court, 1858, the master filed his report, and therein finds due to Matteson, after allowing to him all expenses incurred by him on account of taking charge of the property and selling the same at auction, and also for all money expended in relieving the property from prior liens, the sum of $2,283.70.

Finds due to Constant under his first mortgage, the sum of $2,460.56, and the further sum of $1,915.50 under his second mortgage. Finds due to Russel and Parsons, under their mortgage, $631.98. Finds the amount of Miller and Scott's claim at $1,637.14. Finds due to McCabe and Vanness, $1,107.91. Finds due on the mortgage of R. V. Dodge, assigned to Joel A. Matteson, the sum of four hundred and fifty-six dollars and forty-four cents.

The master further reports the testimony of witnesses examined by him. *Lotus Niles* swears he was present when Constant and Matteson were talking about taking possession of the property mortgaged, under their mortgages. Wickersham, (the mortgagee) then agreed to give possession to C. R. Post, as the agent of Matteson, Constant and R. V. Dodge, they claiming under their mortgages. Wickersham did give possession, in pursuance of the agreement. The conversation took place and the possession was given on the 7th day of July, 1857. C. R. Post took possession of the property, at the time stated, as the agent of Constant and Matteson. The understanding between Constant, Matteson and himself was, that witness should take charge of the property, including the house and furniture, until the sale of the property.

The property was sold under the mortgages, the 20th of July, 1857. Matteson, being about to leave town, said to witness, he wished he would stay at the hotel and keep charge of the property, as he had done, until said Matteson returned. Matteson returned about the first of August, and after his return he requested witness to remain until a sale was made of the property, which he did. Witness met Constant on the street one day, during the absence of Matteson, and after the sale, and told him the expenses of the hotel were greater than the receipts, and asked what should be done in regard to it. Constant replied to do the best he could with it. He asked witness to keep the goods together, and take care of them and keep the affairs straight.

*Fenner Aldrich* testified, that about the 1st of September, 1857, he purchased of Joel A. Matteson, the property bid off

by him at the auction sale under the mortgages. Witness gave $7,489.71, the amount of the former sale bill, in four notes, payable in installments, (the same heretofore described in the answer of Matteson.) Witness has paid $2,200 on the notes. Constant had nothing to do with the sale to witness.

The deposition of *Thomas D. Wickersham,* in answer to an interrogatory to state what he knew in relation to the notes given by Constant and Matteson to Miller and Scott, states:

The notes were given by Archibald E. Constant and Joel A. Matteson, two separate notes for the sum of $752 each, at ten per cent., to Miller and Scott. I think my brother, B. P. Wickersham, took the notes to Miller and Scott, and they or their agents erased the names of Matteson and Constant, saying they were not bankable, and returned them to me by my brother. Says in answer to a cross-interrogatory, that the notes were not re-signed or returned.

*B. P. Wickersham* testifies, that he took the notes above referred to, to Miller and Scott, in St. Louis, and delivered them to them in person, and they handed them, or one of them, back to me, and remarked they were not drawn up in form, and I think one of the notes was cancelled in my presence, and perhaps both of them. I took them back to T. D. Wickersham, at their request, and delivered them to him. States further, that Miller and Scott, about the time of the return of said notes, sent up two blank checks for Matteson and Constant to fill up. Thinks the checks were for the amount of $752 each, and also for the amount of a bill of goods, purchased about the time of the delivery of the notes. Says it was Miller and Scott who talked to him about the cancellation of the notes. Thinks it was the object of Miller and Scott to get security for the additional bill of goods.

*H. H. Hukil* testifies, that he was a clerk for Miller and Scott, and knew T. D. Wickersham. Wickersham purchased goods of Miller and Scott, at two or three different times, amounting altogether to $1,700 or $1,800. Wickersham had a letter from Matteson. A note was sent by Wickersham to Miller and Scott for one-half of the first bill, which note was about $752. Another note was subsequently sent for same amount. One of the notes was signed by Wickersham and Matteson, and the other by Wickersham and Constant. The first note that was sent was not half of the whole bill. Wickersham sent a letter to Miller and Scott to know whether a note for one-half the amount executed by Constant would do. At that time, and in that letter, they received one of the notes. Miller and Scott objected to the note because of the manner in which it was drawn, and the amount. Scott told witness to draw up two notes, dividing the

amount equally, which witness did in the form of drafts, and told witness to write and return the note, and request Wickersham to have the drafts signed and returned.

When the second note was received, witness was directed to make out another draft, which witness did, and returned the note to Wickersham, with the names erased, together with the draft. The amount of the drafts were larger than the notes by about $150.

*Virgil Hickox*, who was examined upon this hearing, testified that the labor and care of Joel A. Matteson, in buying and selling the property embraced in the mortgages, would be five per cent., and that it would be worth five per cent. per annum to advance cash in place of notes at ten per cent. per annum.

Court below decreed that the defendants, Joel A. Matteson and Archibald E. Constant, after the payment of costs, have a prior lien on the proceeds of the property in the pleadings mentioned, for reimbursement to them for advances made by them, and that said Joel A. Matteson, as assignee of R. V. Dodge, has next valid lien on the proceeds of the sale of the cutlery and silverware, secured by mortgage to R. V. Dodge, dated February 23rd, 1857, but to the extent only of the proceeds of said cutlery and silver-ware, and that Archibald E. Constant has the next valid lien by virtue of his second mortgage, dated the 6th day of June, 1857, to the extent of his whole claim under said mortgage, on the entire proceeds of said sale, in the hands of said Matteson. And that David A. Russel and Jacob Parsons, have the next valid lien, by virtue of their mortgage, dated the 27th day of June, 1857, to the extent of their whole claim under said mortgage, on the entire proceeds of sale as aforesaid, and that to the extent of $752, and interest thereon at the rate of six per cent. per annum. Said Miller and Scott have the next valid lien, together with Joel A. Matteson and Archibald E. Constant, to the extent of their entire claim under the first mortgage executed to said Archibald E. Constant, dated December 31, 1856, and the mortgage to Joel A. Matteson, dated December 27th, 1856, the said Miller and Scott together to the extent of seven hundred and fifty-two dollars, and interest thereon, and the said Joel A. Matteson and Archibald E. Constant, to the extent of their entire claim under said last mentioned mortgages, sharing *pro rata* in the proceeds thereof in the hands of said Matteson—*and that out of said Archibald E. Constant's said pro rata as last aforesaid from the proceeds of the said first mortgage to him, dated 31st December, 1856, said Miller and Scott are entitled to be paid the residue of their claim, to wit: the sum of $752 and interest.*

And that said Archibald E. Constant has the next valid claim

on the said proceeds, for the payment of his claim under and by virtue of his first mortgage as aforesaid, dated December 31st, 1856. And that William McCabe and John Q. Vanness have the next valid lien on said proceeds under and by virtue of their mortgage, dated the 9th of March, 1857. And it further appearing to the court that there is due Joel A. Matteson, in the order of priority, as aforesaid, the sum of $1,075.30, for advances made by him, and that there is due from Matteson for board, which is a proper set-off against the same, the sum of $1,250.77, and to A. E. Constant, $121.30, for advances made by him. And to said Joel A. Matteson, as assignee of R. V. Dodge, the sum of $274.25, in the order next of priority, and to Archibald E. Constant the sum of $1,915.50, in the order next of priority. And to Russel and Parsons the sum of six hundred and thirty-one dollars and ninety-eight cents, in the order next of priority. And to Miller and Scott, the sum of $818.57. To Joel A. Matteson $2,283.70, and Archibald E. Constant $2,460.56, to be paid *pro rata* out of A. E. Constant's first mortgage, and Joel A. Matteson's first mortgage. And to Miller and Scott the sum of $818.57, in the order next of priority, to be paid out of Constant's *pro rata* in his first mortgage. And to Archibald E. Constant the sum of $2,460, in the order next of priority. And to McCabe and Vanness the sum of $1,210.35, in the order next of priority. It is therefore ordered, adjudged and decreed by the court that said Joel A. Matteson, Archibald E. Constant and Charles Dunn, nothing take by their judgments and executions, and that out of the proceeds aforesaid, there be paid first the costs of this suit, including a fee to master of $50, and $100 to Joel A. Matteson, both to be taxed as part of the costs. Next to that, $121.30, the advances made by Constant, be paid to him, and that the residue of said claims be paid in priority as herein set forth.

It further appearing to the court that the entire proceeds of the property amounted, on the first of September, 1857, to the sum of $7,489.71, that the sale was made by Joel A. Matteson, and that he is properly chargeable with the proceeds thereof, it is therefore ordered, adjudged and decreed, that said Joel A. Matteson pay out of said proceeds, first, the costs as aforesaid, and the residue of said claims to the extent of the residue of said sum and interest—that he now pay the sum of $3,408.63, and on the 1st day of July, 1859, the sum of $2,165.27, and on the 1st of July, 1860, the sum of $2,348.26, and that executions issue therefor when said sums are respectively due.

That said Joel A. Matteson be allowed to retain out of said funds such portion thereof as is due him by virtue of the provisions of this decree, in installments as provided for by the same.

Archibald E. Constant appeals, and assigns for error:

1st. That the court erred in decreeing payment to Miller and Scott, out of the proceeds of the mortgaged property.

2nd. That the court erred in giving to the claim of Miller and Scott, or to any portion thereof, priority of payment over the first mortgage of appellant, and in decreeing that a portion of said claim should be paid out of the proceeds to which appellant was entitled under his first mortgage, and in not substituting said appellant to the benefit of a *pro rata* distribution, on that portion of Miller and Scott's claim ordered to be paid out of Constant's money.

3rd. That the court erred in postponing execution of any portion of the decree against Matteson.

4th. That the court erred in decreeing costs out of the fund.

LOGAN & HAY, for Appellant.

STUART & EDWARDS, and LINCOLN & HERNDON, for Appellees.

WALKER, J. This is a contest amongst the creditors of Wickersham, for priority in the distribution of a fund produced by sale of chattels, upon which they claim to have liens. It is insisted that Miller and Scott have a lien upon this fund, to the extent of their claim against Wickersham, by reason of a mortgage given by him, on this property, on the 12th day of December, 1856, to Matteson and Constant, to secure them against liabilities they had incurred for him, and to indemnify them against the payment of Miller and Scott's claim, which they then proposed to secure to Miller and Scott by indorsing for Wickersham. It is urged that the lien of complainants is by substitution to the rights of Matteson and Constant, to the extent of their claim on Wickersham. To give the creditor the right to be substituted to the place of the surety of his debtor, the relation of debtor and creditor must exist between the creditor and the surety. The claim on the surety must be valid, binding and capable of being enforced immediately against him. If the relation of creditor and debtor has never existed between them, or having existed, and been terminated by release, or payment, or in any other mode, there can be no substitution. When the surety is liable for the immediate payment of the debt, he may pay it, and resort to the fund he holds, as an indemnity, to reimburse the money he has legally paid for his principal. He is not required to wait until the money is collected by an action, nor will chancery even require it to be paid, if the creditor applies to be substituted to the surety's right to resort to the fund pledged for his indemnity, but will

require the fund to be appropriated directly to the payment of the debt. But unless the surety has the immediate right to pay the debt, and resort to the indemnity, he has no right to which the creditor can be subrogated. When a debtor conveys property to a trustee for the payment of his debt, it is different, for he then appropriates the property to that specific purpose. And if the trustee fails or refuses to so apply it, a court will compel him to appropriate it to the purpose designed. But in a case where the debtor gives a mortgage to indemnify his surety against loss, he only appropriates the property, to be applied to the satisfaction of the debt, when his surety has become immediately liable for, or has paid the debt under such liability. And until such liability or payment takes place, a court of equity cannot interfere.

In this case, Wickersham purchased goods of Miller and Scott on time, with an agreement to give security for payment of the price. But the nature of the security, or the kind of paper to be given does not appear. The bill alleges that he was to give security, but what kind of security, or the person who was to indorse, is not stated. And the answer and proofs equally fail to throw any light on the transaction. The bill nowhere alleges that Matteson and Constant at any time before the purchase was made, agreed to be liable in any event. And if it were true that they had made such an agreement, it is strange that it was not so alleged in the bill, and they required to answer to its truth. Such a fact would be highly important to fix their liability to Miller and Scott, and we presume if it had existed it would have been alleged.

The complainants took the deposition of their book-keeper who states, " That Wickersham came into the store, with a letter, and after he left, Miller informed witness that Wickersham wanted to purchase a bill of goods, and that Gov. Matteson was to accept for the amount of the bill. The letter spoken of was not kept by complainants because, as Miller told witness, Wickersham said he wanted to show it to other parties." This is not evidence to establish any fact. It is the mere declarations of one of the complainants in his own favor, in the absence of the other parties, and called for and proven by himself. The book-keeper does not state that he knew that the letter was from Matteson, that he knew the contents or purport of it, or that he even read or even saw the letter. What it related to, he does not pretend to state. To impose a liability upon Matteson for the payment of the debt of Wickersham upon these statements, would be to violate all the principles of justice, and the rules governing evidence. If there was such a letter, why not produce it, and if that could not be done, then why not

have laid the proper foundation, and proved its contents, or compelled Matteson to make discovery? No such attempt was made, and it must have been for the reason, that if the letter had been produced, it would not have shown any liability on his part. Nor can we presume from the fact that Matteson and Constant chose to indorse those notes as they did, that it was in consequence of any former liability they were under to Miller and Scott. The bill does not so allege nor does it appear in any part of the record.

When Matteson and Constant indorsed these notes, the complainants had it in their power, to bind them for the payment of Wickersham's debt, by accepting the notes. But they rejected, cancelled and returned the notes to Wickersham. And they by so doing, clearly manifested a design not to rely on these notes for any purpose. And this is made more manifest, from the fact, that they required a different kind of paper. If Wickersham had agreed to give them paper of a different kind, and they were unwilling to modify that agreement, by receiving these notes when offered, they must look to him, for a performance of that agreement. They have no claim on Matteson and Constant, nor does the relation of debtor and creditor exist between them, and consequently they have no right to be substituted to a participation in the fund produced from the sale of property under Matteson and Constant's first mortgage.

The question arises, as to the priority of the liens of the various mortgagees on the property, out of which this fund arises. And to determine this, it may be proper to advert to some of the rules governing chattel mortgages. The law deems possession of mortgaged chattels, by the mortgagor, as to *bona fide* creditors and purchasers, to be fraudulent, unless such possession is provided for in the mortgage. And in that case, if the possession continues with the debtor, after the expiration of the time stipulated for it to so remain, it is equally fraudulent. And persons purchasing or acquiring subsequent liens on the property, do so to the exclusion or postponement of prior incumbrances. Where there are several mortgages to different persons on the same property, and they are all over due, and the debtor is holding possession contrary to the terms of the mortgages, any one of the mortgagees may take possession of the property by virtue of his mortgage, and by so doing he acquires a preference over the other mortgagees, similarly situated, without reference to the date of his mortgage. Such creditors are in the situation of several purchasers of a chattel without receiving the possession, where the purchaser who first acquires possession, is preferred. And it is upon the principle that where different equities are equal, the person who unites to his equity the

possession, is preferred. " *Qui prior est tempore potior est jure.*" He who is first in time, is more powerful in law. Upon the forfeiture of the condition in the mortgage, the legal title vests in the mortgagee, and becomes complete upon his obtaining possession. But in some cases, even after a breach of the condition, and possession taken, equity will permit the debtor or his creditors to redeem. Then when the mortgagees in this case obtained possession of the chattels under their mortgages, even if they were over due and fraudulent as to creditors and purchasers, they acquired a preference over all others similarly situated with themselves.

It is urged that when Matteson sold this property on time, he became liable at once to pay the other creditors the money. And that he had no right as a trustee, to sell on a credit. The evidence shows that he took possession of the property, and afterwards purchased it in at the sale, by agreement with, and for the protection of Constant, Dodge and himself, under their mortgages. There is no evidence, which in terms, shows that there was any particular disposition to be made of the property. But when it was purchased for their mutual benefit, under their several mortgages, and no specific agreement as to the mode of its future disposition was made, it will be supposed that it was the design of the parties that it should be sold in the mode best suited to protect their several claims. In selling it in the mode adopted by Matteson, this object might be better promoted than by retaining it, or forcing it on the market for cash. There was no evidence adduced, showing that it could have been sold, either for a better price or on better terms. He obtained for it the sum it cost the parties, and interest on the deferred payments, from the date of sale. We think from all of the circumstances attending the transaction, we may safely infer that he acted in pursuance of the design of the parties, in making the sale. If he did not act in accordance with their design, they have failed to rebut that presumption.

It is again urged, that Matteson, as trustee, is not entitled to receive a compensation for managing this trust property. As a general rule, a trustee is not entitled to compensation, either for his labor or time bestowed in the care of the trust, unless it is by stipulation and agreement. It is his duty to take all reasonable care of the property, and when necessary for its preservation, he may expend reasonable sums of money, or employ agents for the purpose, and so far as such outlays are necessary, he is entitled to have them refunded. But even in this, courts will guard the fund with jealous care, and be vigilant to prevent the fund from being wasted. Matteson would have a right to be paid money expended for employing agents to hold

and preserve the property, in employing the auctioneer and clerk at the sale, to the extent of a reasonable compensation, if it had been claimed. But he is not entitled to a commission or compensation for assuming the responsibility of becoming a trustee, nor for making the sale to Aldrich. To have entitled himself to it, he should have provided for it, by agreement with the parties.

In the pleadings we find nothing requiring, or even authorizing the court to state an account between Matteson and Constant, growing out of their dealings with the hotel after the property was reduced to possession and until its sale to Aldrich. And unless such a case were made by the pleadings, the court has no power to state their accounts, growing out of this transaction. That is a matter with which the other parties have no concern. They were not parties to it, nor was it necessary for the preservation of the property, so far as we can see. It seems to have been a losing business, and it is not right that this fund should be applied to cover that loss. The other creditors not being parties to the transaction, have no interest in the board bills due the hotel, or debts and liabilities incurred on its account. These are matters between Matteson and Constant, and outside of the issues involved in this case.

The court below erred in allowing Matteson a solicitor's fee, to be taxed on the fund as costs in the case. The statute regulating fees of officers, provides for no such fee as that of an attorney or solicitor; and the court must, in taxing and allowing costs, look to the statute as its warrant of authority. While the court of equity has a discretion in awarding costs in chancery causes, it must confine that discretion to the fees allowed by the statute.

It is conceded by all the parties in interest, that Dodge's mortgage was a prior and first lien on all the money arising from a sale of the silver-plated ware, and that his debt was more than sufficient to absorb the whole of that portion of the fund; and, as his mortgage embraced no other portion of the property, it is confined to that alone.

McCabe and Van Ness, although holding a junior mortgage to those of Matteson and Constant, dated December the 12th, 1856, after the first of June, 1857, and until the 6th of that month, had an equal right with them to have reduced the property to possession under their mortgage falling due in the month of May previous. But failing to do so, Constant acquired a superior lien by his mortgage of the 6th of June, 1857. And when Matteson and Constant obtained possession under this latter mortgage, and those of the 12th of December, 1856, they acquired a superior lien under all these mortgages, to that

of McCabe and Van Ness.  But all of these mortgages, except that of Constant of the sixth of June, were postponed by the mortgage to Russell and Parsons of the 27th June, 1857, which was not due when possession of the property was taken.  Their mortgage would stand as a lien next in order after Constant's second mortgage, and prior to his and Matteson's mortgages of December 12th, 1856.  And the claim of McCabe and Van Ness, the claim of Miller and Scott, and the claim of Dunn, were all postponed to Dodge's claim, Constant's claim under his second mortgage, Russell and Parsons' claim, and the claims of Matteson and Constant under their mortgages of the 12th December, 1856.

We are of opinion that the decree of the Circuit Court should be reversed, and that the proper decree to which the parties are entitled under this record, should be entered in this court.

*Decree reversed.*

NOTE.—The following is the decree directed to be entered:

It is therefore considered and found by the court, that the sum of seven thousand four hundred and eighty-nine dollars, for which the said property was sold by said Matteson to said Aldrich, is a trust and proper fund for distribution among Wickersham's creditors, who are parties to this bill; and that the same, collected and yet to be collected under the two notes of Aldrich last falling due and now unpaid, is in the hands of and held by said Matteson as trustee for said creditors. The court, from the record in this case, finds that the costs of the court below, and of this court, are properly chargeable on the said fund.

The court further finds that there was due to the said Joel A. Matteson, as the assignee of the said R. V. Dodge, on the 19th day of November, 1858, from the said T. D. Wickersham, the sum of four hundred and ninety-four dollars and eight cents, as appears from the proofs in the record herein. The court further finds from the proofs in the record, that there was due to the said Archibald E. Constant, from the said Wickersham, on the 19th day of November, 1858, the sum of one thousand nine hundred and fifteen dollars and fifty cents, under his claim secured by mortgage of the 6th of June, 1857. The court further finds from the proofs in the record, that there was due from the said Wickersham to the said David A. Russell and Jacob Parsons, on the 19th day of November, 1858, the sum of six hundred and thirty-one dollars and ninety-eight cents, on their claim secured by mortgage of the 27th June, 1857. The court further finds that there was due to the said Joel A. Matteson from the said Wickersham, on the 19th day of November, 1858, the sum of two thousand four hundred and sixty dollars and fifty-six cents, on his claim secured by mortgage dated the 12th day of December, 1856. The court further finds that there was due to the said Archibald E. Constant from the said Wickersham, on the 19th day of November, 1858, the sum of two thousand four hundred and sixty dollars and fifty-six cents, secured by mortgage dated the 12th day of December, 1856. The court further finds that there was due to William McCabe and John Q. Van Ness from the said Wickersham, on the 19th day of November, 1858, the sum of twelve hundred and ten dollars and thirty cents, under their mortgage dated the 9th day of March, 1857. The court further finds that on the same day, there was due to the said Walter T. H. Miller and Solomon Scott from the said Wickersham, the sum of one thousand six hundred and thirty-seven dollars and fourteen cents, for goods sold to him. And the court further finds that the said Wickersham was indebted to the said Charles Dunn, on the 19th November, 1858, in the sum of one thousand seven hundred and forty-seven dollars and ninety-four cents. And the court further finds that the foregoing claims are properly and of right entitled to a distribution out of said fund in the order as hereinafter decreed.

It is thereupon ordered and decreed by the court, that the said Joel A. Matteson, within ten days after the filing of this decree with the clerk of the Supreme Court of the second grand division, pay out of the said fund, all of the costs in this cause, as well in the Sangamon Circuit Court as of this court, and a fee of fifty dollars to A. Campbell, master in chancery, as a part of the costs of the court below. It is further ordered that the said Matteson be and he is allowed to retain and hold, out of the said fund, the sum of two hundred and seventy-four dollars and twenty-five cents, the amount of said fund to which he is entitled by his first lien thereon, as assignee of the said Dodge, it being the proceeds of the sale of the silver-plated ware. It is further ordered and decreed, that the said Matteson, next in its order of priority of lien, within ten days after filing this decree as aforesaid, pay out of said fund, to the said Archibald E. Constant, the sum of one thousand nine hundred and fifteen dollars and fifty cents, with interest, from the said nineteenth day of November, 1858, at the rate of six per cent., until paid, it being the sum so found due to him, under his mortgage of 6th June. It is further ordered and decreed by the court, that the said Matteson next pay in the order of distribution and priority, out of said fund, to the said David A. Russell and Jacob Parsons, within two days after this decree shall be filed as aforesaid, the sum of six hundred and thirty-one dollars and ninety-eight cents, with six per cent. interest, from the said 19th day of November, 1858, until paid, it being the amount so found to be due to them, as aforesaid. It is further ordered and decreed by the court, that the said Matteson be permitted and authorized to hold and retain, out of said fund, the sum of two thousand four hundred and sixty dollars and fifty-six cents, with interest thereon, at the rate of six per cent., from the 19th day of November, 1858, until the filing of this decree, it being the amount so found due him under his mortgage of the 12th December, 1856. And that he pay to said Constant, out of the said fund, the sum of two thousand four hundred and sixty dollars and fifty-six cents, with six per cent. interest, from the 19th Nov. 1858 until paid, the amount found to be due him under his mortgage of December 12th, 1856. And that in distributing and paying these two latter claims, that the sum which has been already collected on said fund and which shall not be exhausted by the payment of the costs, the sum to be retained under the Dodge claim, Constant's claim, under his second mortgage, and Russell and Parsons' claim as herein decreed to be paid, shall be equally divided between the said Matteson and Constant, on their said claims under their mortgages of the 12th December, 1856, and that the half thereof to Constant, be paid to him by the said Matteson, within ten days from the filing of this decree. And it is further ordered and decreed, that so soon as the money shall be collected on Aldrich's note, falling due on the first day of July, 1859, the same shall in like manner be equally divided between the said Matteson and Constant, on their claims under their mortgages of the date of December 12th, 1856, and that the said Matteson pay to the said Constant, one-half thereof, within ten days after the same shall be collected. And it is further ordered and decreed, that when the money shall be collected on Aldrich's note, falling due the first day of July, 1860, the balance of their claims under their mortgages of the 12th of December, 1856, be paid and satisfied with interest thereon, if said fund shall be sufficient for that purpose, and if not, that then the same be equally divided between them. And that said Matteson pay to the said Constant, his share of the fund arising from the last of said notes, within ten days after the same shall be received and collected. And it is further ordered and decreed, that if there shall still remain any portion of said fund, after paying the several aforesaid sums and interest, that such balance be distributed and divided in *pro rata* proportions between the said Miller and Scott, on their claim of $1,637.14, McCabe and Van Ness, on their claim of $1,210.35, and the said Dunn, on his claim of $1,747.94, and that the said Matteson pay to each of them, such *pro rata* portion on their claims, out of the balance of said fund as aforesaid, if any balance there shall be, within ten days after the same shall be collected.

And it is further ordered and decreed, that if the said Matteson shall fail or refuse to pay any or either of said sums of money within the time, or in the manner specified, that an execution or executions may issue for the collection thereof, in the same manner as upon judgments at law.