Argued June 18, affirmed July 22, 1959

# SCOTT & PAYNE *v.* POTOMAC INSUR-ANCE COMPANY

341 P. 2d 1083

*James B. O'Hanlon,* Portland, argued the cause for appellant. With him on the briefs were Mautz, Souther, Spaulding, Denecke & Kinsey, Portland.

*Seymour L. Coblens* argued the cause for respondents. On the brief were Reinhardt & Coblens, Portland.

Before MCALLISTER, Chief Justice, and WARNER, SLOAN and MILLARD, Justices.

SLOAN, J.

The trial court awarded plaintiffs a judgment against defendant for amounts expended by plaintiffs to settle a claim against plaintiffs for alleged malpractice on their part as professional architects. Plaintiffs were the named insureds in "Architect's Professional Liability" policies issued by defendant. This

action is founded on these policies. For convenience we will refer to them as "policy." Defendant denied any liability within the terms of its policies for the claim made against plaintiffs. Defendant appeals. We will review the facts before mentioning the assignments of error.

During the period of time pertinent to the case, and for some years prior, plaintiffs had been licensed by the state of Oregon to engage in the "Practice of Architecture." ORS 671.010 et seq. In 1950 they entered into a contract with the Central Oregon District Hospital, at Redmond, to perform "The Architect's professional services [to] consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full-size detail drawings, for architectural, structural, plumbing, *heating,* electrical, and other mechanical work; assistance in the drafting of forms of proposals and contract; the issuance of certification of payment; the keeping of accounts, the general administration of the business and *supervision of the work.*" (Italics ours.) This contract was on the familiar "Standard Form of Agreement Between Owner and Architect" issued by the American Institute of Architects. Plaintiffs did prepare the general plans and specifications. They did, however, employ a firm of heating experts to design the heating system to be installed in the hospital building. The heating engineers were employed at plaintiffs' cost and functioned at the direction of plaintiffs, not at the direction of the hospital district. It is to be noted the contract placed the ultimate responsibility to design a heating system upon plaintiffs. The heating system as designed and subsequently installed presents the problem with which we are involved in this case.

The system was designed to heat the building with hot water flowing through copper pipes imbedded in the concrete floor and within the ceiling of the building, a form of heating commonly known as "radiant" heating. The plan provided that certain main ducts would carry the hot water from the boiler. From these mains the system was "broken up" with "small panels" extending from the mains to heat the individual rooms and groups of rooms. It was intended that about 15 per cent of the total heat would be provided by the coils of pipe or tubing in the floor; the remainder, from the coils installed in the ceiling. There is no contention but that the original design was a standard, adequate heating system.

This type of system, as designed, has been frequently and successfully used, from ancient times. Although it is generally known to be a fine heating system, it must also be evident that when the conductors of the hot water are imbedded in the concrete floor and under the plaster of the ceiling, a poor installation can be extremely costly to repair.

The trouble started when the federal government prohibited the use of copper tubing for this purpose as a result of the Korean War. That was in 1951 and after the hospital was under construction. The governing body of the hospital district did not want to delay construction and requested plaintiffs to try to find a suitable substitute for the copper tubing. Plaintiffs were informed of a tin-plated steel tubing manufactured by General Motors. The manufacturer represented the product to be an equivalent substitute for copper tubing and suitable for use in place of copper. The plaintiffs consulted with the heating experts who designed the system and learned that these experts thought the substitution would be suitable. The board

of the hospital district agreed to the change. Accordingly, the steel tubing was installed in lieu of the copper. It is important to note that the plaintiffs made no change in the design of the method or manner of installation of the steel. Accordingly, it was installed in exactly the same manner that was designed for the use of copper tubing. The installation began in November or December of 1951 and continued into 1952. On December 31, 1951, the installation was about one-half completed.

The date of December 31, 1951, is important in this case and presents a basis for a principal defense. The policy period of defendant's policies began on that date. The policy period of insurance terminated on December 31, 1953.

Beginning in the late winter or spring of 1953 the hospital was beset with sporadic leaking of water from the heating system, both from the floor and ceiling installations. The plaintiffs were notified of this difficulty and called upon the contractor who installed it to make repair and correction. The contractor obliged by repairing several leaks until the problem became so acute that it was obvious that there was an inherent failure of the heating system and particular repair of each point of leakage would no longer suffice. It was apparently in about June of 1953 that it was determined that the steel pipe imbedded in the concrete floors had materially dissolved by corrosion. The floor system was, thereby, rendered inoperative. It was possible to continue to use the ceiling system for the remainder of the year 1953 and to the end of the heating season of 1954. During the summer of 1954 the hospital district caused a heating engineer to make a thorough investigation of the system to determine what was needed to correct the obvious

failure. The testimony of this engineer was the only evidence presented at the trial of this case in respect to the cause of the failure of the heating system.

He testified that with reference to the ceiling system, steel tubing did not possess the pliability of copper tubing; that provision should have been made to allow for the greater expansion of steel tubing in contrast to copper and that this was not done; that the failure to install "expansion joints" and sufficient "anchors" was the principal cause of the failure in the ceiling installation. The leaks occurred at points on the tubing where sufficient provision for expansion was not made. The pipes installed in the concrete floor simply corroded away in a period of a few months.

Following this investigation by a heating engineer the hospital district, by its attorneys, make demand upon plaintiffs for immediate correction of the failure. The cost of correction was estimated at between $40,000 and $50,000. The plaintiffs submitted this demand to defendant and demanded coverage under the liability policies. The defendant responded to this demand by a denial of coverage. The amount of the potential liability caused understandable concern to plaintiffs. As a result of negotiations between the attorneys for the plaintiff and the hospital district a settlement was concluded which required the total payment of $956.66 on the part of plaintiffs. This settlement was so obviously advantageous to plaintiffs that defendant concedes it was a reasonable settlement. Plaintiff was also obliged to pay their attorney $300, so the amount sued for by this action is a total of $1,256.66, plus the attorney's fees resulting from this litigation. During the course of the negotiations for this settlement, and prior to its consummation, the plaintiffs informed defendant and demanded payment of the

amount agreed upon. Defendant refused. This action followed.

During the period of negotiation and settlement defendant contended that there was no coverage because there had been no "accident" within the requirements of the policy. This position was apparently abandoned in the trial court. The defendant then contended that there had been no act, failure or omission of the plaintiff within the policy period, or at any time, as required to come within the policy. The policy required the defendant:

> "To pay on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons; and because of injury to or destruction of property, including the loss of use thereof, all in direct consequence of any negligent act, error or omission of the Insured resulting in accident, in the performance of professional services for others in the Insured's profession as architect."

The case was tried to the court without a jury. The court made findings in favor of plaintiffs and this appeal followed.

██ Defendant's first assignment complains of the refusal of the trial court to allow its motion for a judgment on the pleadings. The motion was made orally at the start of the trial. It might be observed that the pleadings had been well laundered by that time as a result of extensive motions and demurrers. The motion for judgment was based entirely upon the insufficiency of the complaint. A motion for judgment on the pleadings is not one favored by the courts. It

cannot be used as a substitute for demurrer if the complaint was amendable so as to state a good cause of action. The complaint in this case could have been thus amended. *Lytle v. Payette-Oregon Irr. Dist.*, 175 Or 276, 152 P2d 934, 156 ALR 894. The motion is only allowable when the pleadings, taken together, affirmatively show that plaintiff has no cause of action against the defendant or when defendant affirmatively alleges a complete defense which is admitted or not denied by a reply. *Morford v. Calif.-West. Life Co.*, 161 Or 113, 120, 88 P2d 303; ORS 16.130.

■ In this case defendant contends plaintiffs' complaint failed to allege any acts of negligence on the part of plaintiff which come within the terms of the policy. Even if this be so, and the complaint is not a model, the defect, if any, was cured by the answer. By a first affirmative answer the defendant alleges: "That the damages referred to in plaintiffs' amended complaint were not caused and the insured plaintiffs did not become obligated to said hospital, by reason of liability imposed upon them by law for damages resulting from negligent act, error or omission resulting in accident." A third affirmative defense alleged that plaintiffs had not been guilty of any act, error or omission within the policy period. Both of the affirmative answers were denied in plaintiffs' reply. These pleadings present issues of fact. They formed the issues presented to the trial court and on appeal here. *Morford v. Calif.-West. Life Co.*, supra, is quite similar. It was an action to collect the proceeds of a life insurance policy. The defendant life insurance company moved for judgment on the pleadings for the reason that the complaint failed to allege delivery of the policy of insurance to the plaintiff's decedent, an essential allegation. The court held that the failure

of the complaint was cured by an affirmative allegation in the answer that the policy had not been delivered, which was effectively denied by the reply. This assignment is without merit.

The defendant's second and third assignments both assert that the court erred "in failing to find for the defendant as a matter of law." It is first argued that no negligence was established on the part of plaintiffs in the performance of its duty to the hospital. It is also contended that the negligence, if any, was in design; that the design was made by someone other than plaintiffs and prior to the policy period. It is further contended that no act or omission of plaintiffs, even if negligent, occurred during the policy period. The answer to these assignments is largely factual.

■■ In the first place it is to be remembered that this case was tried to the court sitting as a jury. If there is evidence to support the court's findings, we cannot disturb them. *White v. Pallay,* 119 Or 97, 247 P 316. The same case holds that it is the duty of an architect to "act with reasonable diligence in the performance of his duties" and that the determination of the question of the architect's failure to meet this duty is one of fact. 119 Or 100. By "Editorial Comment" the editors of ALR say: "This skill and ability which he is bound to exercise are such as are ordinarily required of architects, which is a higher degree than that required of unskilled persons." 25 ALR2d 1086. An interesting comment on "When is an Architect Liable?" by Gibson B. Witherspoon is found in 21 Ins Counsel J 468.

■ It is also held that when, as here, the contract between the architect and owner requires inspection

and supervision during the construction he must exercise the same degree of care in the performance of that duty. 6 CJS 318, Architects § 19; *Avent v. Proffitt,* 109 SC 48, 95 SE 434. *Hubert v. Aitken,* 2 NYS 711, aff'd. 5 NYS 839, aff'd. without opinion 123 NY 655, 25 NE 954, defines with perhaps more precision the duty of the architect to supervise construction. It is there said:

"* * *. An architect is no more a mere overseer or foreman or watchman than he is a guarantor of a flawless building, and the only question that can arise in a case where general performance of duty is shown is whether, considering all the circumstances and peculiar facts involved, he has or has not been guilty of negligence. This is a question of fact, and not of law." 5 NYS 840.

■ We think the evidence in this case supports the findings of the trial court that plaintiffs were negligent. The real question is: Was there any act of negligence which occurred during the policy period; that is, after December 31, 1951, and before December 31, 1953. The change in material from copper to steel was made prior to December 31, 1951. If there had been negligence in making that change without correction in the prior design then the negligence would not avail the plaintiffs. It occurred before the effective date of the policy. However, there is evidence, which we must accept as true, from which negligence could be inferred by the trier of fact. The plaintiff Scott testified in this manner:

"Q In your cross examination you said that certain changes were suggested during the course of the construction of the work.

"Now, what was the nature of those changes and who suggested them?

"A Well, one that I can think of particularly

was that made by either Bohren [Bohren was the contractor who installed the heating system.] or one of his employees. I believe it was his foreman. It concerned his concern for the length of pipe in relation to the expansion that was going to be put on it and he was concerned about it and thought that something should be done to provide some means of combatting the problem that might arise.

"Q Was that made in the year 1952?

"A Yes.

"Q Did that suggestion with respect to expansion joints in the ceiling, was that carried out?

"A No, it wasn't."

This testimony discloses that the precise failure which was a material causal factor in the subsequent damage was thereby called to the direct attention of plaintiffs and an opportunity afforded to correct the deficiency within the policy period. The trier of fact could well have determined that this failure of plaintiffs, after direct warning, was an act of negligence. We have no power to "gainsay it." *White v. Pallay,* supra.

We are told, however, that the failure, if any, was not the neglect of plaintiffs; that plaintiffs had a right to rely on the representation of the manufacturer and of the approval of its use by the heating engineer employed by plaintiffs to design the heating system. We are cited to *Seay v. Georgia Life Ins. Co.,* 179 SW 312, 132 Tenn 673. That was a case involving the liability of an insurer to its physician policy holder. The alleged negligence was that of the doctor's assistant. The court found that "the assistant diagnosed and treated the patient without suggestion or aid from complainant. From a professional standpoint the assistant was acting independently. The insurer had no benefit of the supervising skill or instruction

of complainant for which it contracted." 179 SW 313. The brief quote is sufficient to distinguish that case from the one at bar. Here the heating engineer was acting solely under the direction of the plaintiffs and plaintiffs, by the contract with the hospital district, were directly responsible for the design and supervision of the installation of the heating system. A principal can be liable for the malpractice of his agent, assistant or employe. *Moulton v. Huckleberry*, 150 Or 538, 549, 46 P2d 589; *Olson v. McAtee*, 181 Or 503, 182 P2d 979. Not only that but the testimony we have quoted is evidence of a direct negligent failure upon the part of plaintiffs.

The evidence also discloses that plaintiffs knew nothing of the material or its use; they made no independent effort to ascertain the true suitability of the substitute material and if it could be safely installed in the precise manner originally prescribed for the copper tubing. The difference in the expansion and ductable characteristics of steel and copper are commonly known. The trial court could well have found that the failure of plaintiffs to make any variation in the method of installation of the substitute material was a failure to exercise the required degree of skill. This would be particularly true when the shortcoming was specifically called to their attention.

It ill behooves a man professing professional skill to say I know nothing of an article which I am called upon to use in the practice of my profession. This thought finds pungent expression in *Hubert v. Aitken*, supra, 2 NYS 711, 712:

"* * *. The architect who undertakes to construct a house that is to be heated by steam is groping in the dark unless he knows how large a chimney is required. It is as necessary that the

architect should know what is needed to make the steam-heating apparatus serviceable, as it is that he should know how sewer gas is to be kept out of the house. No one would contend that at this day an architect could shelter himself behind the plumber, and excuse his ignorance of the ordinary appliances for sanitary ventilation by saying that he was not an expert in the trade of plumbing. He is an expert in carpentry, in cements, in mortar, in the strength of materials, in the art of constructing the walls, the floors, the stair-cases, the roofs, and is in duty bound to possess reasonable skill and knowledge as to all these things; and when, in the progress of civilization, new conveniences are introduced into our homes, and become, not curious novelties, but the customary means of securing the comfort of the unpretentious citizen, why should not the architect be expected to possess the technical learning respecting them that is exacted of him with respect to other and older branches of his professional studies? It is not asking too much of the man who assumes that he is competent to build a house at a cost of more than $100,000, and to arrange that it shall be heated by steam, to insist that he shall know how to proportion his chimney to the boiler. It is not enough for him to say, 'I asked the steamfitter,' and then throw the consequences of any error that may be made upon the employer who engages him, relying upon his skill. Responsibility cannot be shifted in that way."

The duty of the architect should not be said to be less exacting than that defined by the above opinion of seventy years ago.

What we have said disposes of the issues of this case. It follows that the judgment of the trial court is affirmed and plaintiffs are awarded an additional attorney's fee of $250 for resisting this appeal.

The judgment is affirmed.