St. Joseph Hospital, Plaintiff-Appellee, *v.* Corbetta Construction Co., Inc., *et al.*, Defendants-Appellants.

(Nos. 56452, 56761 cons.;

First District (1st Division)—June 3, 1974.

*Modified on denial of rehearing August 19, 1974.*

926

Winston & Strawn, Mayer, Brown & Platt, and Tom L. Yates, all of Chicago, for appellants.

O'Keefe, Ashenden, O'Brien & Hanson and Finn and Le Sueur, both of Chicago, for appellee.

Mr. JUSTICE HALLETT delivered the opinion of the court:

This involves consolidated appeals from two actions in the circuit court of Cook County. Both arose primarily out of problems flowing from the installation of Textolite plastic laminate wall paneling on the walls of the new St. Joseph Hospital during its construction, which paneling proved

to have a "flame spread" rating some 17 times the maximum permitted under the Chicago Building Code and had to be replaced with paneling complying with said Code.

The first was a declaratory judgment action brought by the Hospital against its architect, the contractor and the manufacturer-supplier of said wall paneling. The second was an action at law brought by the manufacturer-supplier against the contractor for the price of said original paneling. Further discussion of the litigation, its outcome and the various appeals will be deferred for the present.

While this is an extremely long (hundreds of documents, 5000 pages of transcript, and 444 pages of appellate briefs) consolidated appeal, involving two lawsuits, four adverse parties and two jury trials (taking 6½ weeks), the "bare bones" of the controversy are relatively simple.

The St. Joseph Hospital (the Hospital) in 1958 entered into a contract with architect Belli & Belli of Missouri (Belli) for the erection of a hospital on a new site in Chicago to replace one erected before the Great Chicago Fire of 1871, and the general construction of the hospital was undertaken by the Corbetta Construction Company (Corbetta). In April of 1965, when the building had been substantially completed, the Hospital was advised by the city collector that its application for a license to operate the Hospital had been disapproved because the wall paneling (General Electric's "Textolite") which covered its rooms and corridors, and had been manufactured and furnished by the General Electric Company (General Electric), did not comply with a Chicago Code requirement that such paneling have a "flame spread" rating of not to exceed 15. Actually it had a rating of 255, 17 times the maximum. The city also threatened criminal action against the Hospital for operating without said license.

At this juncture, the Hospital called upon all of the parties involved to remedy the situation and withheld from Corbetta final payment of some $453,000. Although all of the parties deplored the situation, each took the position that it was not itself at fault and that only others were to blame. At about this time Corbetta advised the Hospital that it was their intention to file suit for the $453,000 so withheld by the Hospital.

Faced with the threat of two lawsuits and a complete shutdown of its operation, the Hospital, on May 14, 1965, filed a complaint for declaratory judgment against Corbetta, Belli and General Electric, setting forth the above described controversy between the parties, and attaching copies of the various contracts, subcontracts and applicable municipal ordinances. As the result of a petition for immediate relief, an order was entered in this action, permitting the Hospital to take immediate steps

to remove the Textolite wall paneling and to replace it with paneling approved by the city of Chicago, all without prejudice to the rights of any of the parties.

Under this order, the Textolite wall paneling was removed and replaced with Westinghouse Micarta paneling, an asbestos plastic laminate installed on an asbestos panel, meeting the 15 flame-spread rating of the Chicago Building Code, at a total cost of some $300,000.

Meanwhile, the Hospital amended its complaint; various motions to dismiss by Belli and General Electric were filed and denied; Corbetta counterclaimed against the Hospital, Belli and General Electric; Belli cross-claimed against Corbetta and General Electric; and, eventually, appropriate answers were filed to the complaints, counterclaims and cross-claims and the case was at issue. The trial court, on the motion of the Hospital, segregated the various counterclaims and cross-claims from the question of liability and this is not here challenged. It also deferred the question of damages until after liability had been determined and this is here challenged only by Belli.

The jury in the trial with respect to liability to the Hospital rendered a verdict against all three defendants. At the close of all the evidence in said trial, the court directed a verdict for the Hospital and against Corbetta on its counterclaim. A subsequent jury then determined that the costs of reconstructing the corridors of the Hospital with a wall paneling which complied with the Chicago Building Code, plus attorneys' fees, were $431,770.55. In addition, Corbetta and General Electric were found jointly and severally liable to the Hospital for attorneys' litigation expenses of $112,251.21.

The various defendants had filed cross-claims against each other, each contending that any recovery by the Hospital against it should be passed on to other defendants. At the conclusion of the jury trial on the question of liability, all defendants waived jury and submitted their cross-claims to the court, which denied all such indemnity claims. The Hospital having retained amounts awarded it, Corbetta was given a separate judgment against Belli and General Electric for one-third of the damages and against General Electric for one-half of the litigation expense. The result is that, under the present judgment, each of the three defendants will bear one-third of the general damages and that Corbetta and General Electric will each bear one-half of the Hospital's litigation expense.

Under a second count of its complaint, the Hospital sought to recover from all three defendants for the cost of reconstructing portions of the corridor walls behind which were located pipe or access spaces, to meet the city's one hour fire resistance requirements. Judgment was entered on this count for the Hospital against Belli, for $17,178.31.

The second lawsuit, Case No. 56761, is an action by General Electric against Corbetta, seeking to recover payment for the Textolite plastic laminate wall paneling originally affixed to the walls of the hospital. The trial court dismissed this action on Corbetta's motion on the ground that the material facts determined in the case brought by the Hospital against all three defendants precluded General Electric from recovery.

All three defendants have appealed, raising many issues. Rather than to note each party's various contentions here, we shall discuss the issues under *nine* general headings, noting the several parties' positions with respect thereto as seems appropriate.

## I.

■■ As we see it, the *first* question to be resolved is whether the trial court erred in refusing to dismiss the Hospital's complaint for declaratory judgment. Only defendant Belli here challenges this ruling.

Section 57.1 of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 57.1) provides as follows:

> "§ 57.1. Declaratory judgments. (1) No action or proceeding is open to objection on the ground that a merely declaratory judgment, decree or order is sought thereby. The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy."

The Hospital's filing its declaratory action when it did, without waiting for an even more complete disaster, certainly was proper.

In *Trossman v. Trossman* (1960), 24 Ill.App.2d 521, 165 N.E.2d 368, this court, in reversing the dismissal of a declaratory judgment action and remanding the cause for further proceedings, at page 531, quoted as follows from 26 C.J.S. *Declaratory Judgments* § 28 (1956):

> " 'It is not essential to a proceeding for a declaratory judgment that there be a violation of a right, a breach of duty, or a wrong committed by one party against the other. The mere existence of a cloud, the denial of a right, the assertion of an unfounded claim, the existence of conflicting claims, or the uncertainty or insecurity occasioned by new events may constitute the operative facts entitling a party to declaratory relief.' "

In *Walton Playboy Clubs, Inc. v. City of Chicago* (1962), 37 Ill.App. 2d 425, 185 N.E.2d 719, in affirming (with some modifications) a declaratory judgment involving a threatened revocation of the plaintiff's license to do business, this court, at pages 428-429, said:

"Apart from this, the situation confronting the plaintiff at the time this suit was started made it singularly fitting to seek relief by way of declaratory judgment. The plaintiff had made a large investment in a business which, in its general outline, was in conformity with several others, long-conducted without interference by the City. It had received from the Department of Police an official opinion of the City's Department of Law stating that its method of doing business was illegal. It had every reason to believe that the City would proceed against it in accordance with the opinion. The success of its business depended upon the sale of memberships and the threat of having its licenses revoked would discourage their sale. Its business and its investment were in jeopardy. A justiciable controversy existed. The facts and the interpretation of the applicable statutes were in dispute. The plaintiff did not have to sit back and wait for the blow to fall just because the altercation might be decided in an alternative action (Liquor Control Act, Ill Rev Stats (1959) c43) which the City could invoke when it got ready. This was especially so in view of the plaintiff's offer in its complaint to promptly comply with the court's construction of the law. American Civil Liberties Union v. City of Chicago, 3 Ill2d 334, 121 NE2d 585; Kitt v. City of Chicago, 415 Ill 246, 112 NE2d 607; Retail Liquor Dealers' Protective Ass'n v. Fleck, 408 Ill 219, 96 NE2d 556."

To the same general effect, see *Roberts v. Roberts* (1967), 90 Ill.App. 2d 184, 187, 234 N.E.2d 372; *La Salle Casualty Co. v. Lobono* (1968), 93 Ill.App.2d 114, 117-118, 236 N.E.2d 405; *Crest Commercial, Inc. v. Union-Hall, Inc.* (1968), 104 Ill.App.2d 110, 114-115, 243 N.E.2d 652.

In its opening brief, Belli contends that the plaintiff's complaint should have been dismissed because an adequate remedy at law was available to the plaintiff. Reliance is placed upon only one case, *Goldberg v. Valve Corporation of America* (1967), 89 Ill.App.2d 383, 233 N.E.2d 85. It was there held that an action brought by an employee who had a written contract of employment, which had been terminated by his employer, did not properly come within the ambit of the Declaratory Judgment Act. In that case, the court, at page 392, said:

"Plaintiff now by his complaint seeks not to have his present rights in an existing contract declared in a preventive fashion, rather he endeavors to have them enforced and executed after

the fact. *He has shown no actual and present controversy in its true sense.*" (Emphasis supplied.)

Furthermore in *Goldberg,* the contract had been terminated and the damages, if any (the opinion seems to express doubt that any could arise) were ascertainable. Here, the contract had not been completed and the damages could not yet be ascertained, and were not in fact ascertained until the Textolite wall paneling had been removed and paneling meeting the City Building Code had replaced it. It should also be noted that legal writers and other Illinois cases appear to express views differing considerably from some of those expressed in *Goldberg.*

In *American Civil Liberties Union v. Chicago,* 3 Ill.2d 334, 353, 121 N.E.2d 585, Mr. Justice Schaefer, speaking for our supreme court, at page 353, said:

"* * * Defendants' contention that the availability of affirmative relief by way of *mandamus* bars an action for a declaratory judgment is refuted by the explicit language of section 57½ of the Civil Practice Act. (Ill. Rev. Stat. 1953, chap. 110, par. 181.1.) *Goodyear Tire and Rubber Co. v. Tierney,* 411 Ill. 421, is not to the contrary. We there held only that a plaintiff desiring to challenge the validity of a tax assessment must pursue the statutory remedies provided by the Revenue Act, and that a declaratory judgment, like an injunction, could not be had in the absence of circumstances supplying a basis for interference with the collection of taxes. The case in no way suggests that an action for declaratory relief is defeated by the mere existence of another form of action which could presently be employed."

To the same effect see *Koziol v. Village of Rosemont* (1961), 32 Ill. App.2d 320, 327, 177 N.E.2d 867; *La Salle Casualty Co. v. Lobono* (1968), 93 Ill.App.2d 114, 118, 236 N.E.2d 405; *Kitt v. City of Chicago* (1953), 415 Ill. 246, 252, 12 N.E.2d 607; *Elm Lawn Cemetery Co. v. City of Northlake* (1968), 94 Ill.App.2d 387, 391, 237 N.E.2d 345; *Young v. Hansen* (1969), 118 Ill.App.2d 1, 5-6, 249 N.E.2d 300.

We therefore conclude that declaratory judgment was properly employed in this case.

## II.

■■ The *second* question to be resolved, as we see it, is whether the trial court erred in conducting separate trials, one to determine the basic liability of the various defendants to the Hospital and, another to determine how much the Hospital should recover (by retention or otherwise) to compensate it for the removal of the Textolite wall paneling and the subsequent installation of Micarta wall paneling meeting the require-

ments of the City Building Code. Again, no defendant other than Belli challenges the procedure adopted by the trial court.

In its opening brief, Belli cited no cases and contended only that:

"* * * We know of no authority for such procedure in Illinois courts, the only provisions for severance being contained in The Illinois Practice Act, chapter 110, I.R.S., Paragraphs 22, 44 and 51. Paragraph 23 permits servance [sic] as to parties. Paragraph 44 permits separate trial as to causes of action as does paragraph 51. Nothing permits or authorizes separate trials on the issues of liability and damages. * * *"

Later it supplemented its brief by citing *Mason v. Dunn* (1972), 6 Ill. App.3d 448, 285 N.E.2d 191, where the Appellate Court for the Second District held that, in the trial of a personal injury action, "there is no statute or Supreme Court rule in Illinois which expressly allows severance of issues" and "that the trial court is without inherent authority to sever the issues of liability and damages." It therefore reversed a judgment so reached and remanded the case for a new trial.

Both said argument and said case miss the point, in that, as we have above demonstrated and held, the case at bar was properly brought and prosecuted as an action for declaratory judgment, with provisions expressly providing for the adjudication or declaration of rights in the first instance, followed, if necessary, with further coercive action, including money judgments.

Section 57.1 of the Civil Practice Act (Ill. Rev. Stat. 1965, ch. 110, par. 57.1), entitled "Declaratory Judgments," in parts here pertinent, provides:

"(2) Subject to rules, declarations of rights, as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well, and if a declaration of rights is the only relief asked, the case may be set for early hearing as in the case of a motion.

(3) If further relief based upon a declaration of right becomes necessary or proper after the declaration has been made, application may be made by petition to any court having jurisdiction for an order directed to any party or parties whose rights have been determined by the declaration to show cause why the further relief should not be granted forthwith, upon reasonable notice prescribed by the court in its order."

In Jenner & Tone's Historical and Practice Notes (S.H.A. (1965), ch. 110, par. 57.1, at 132), it is said:

"* * * It is now settled in Illinois and other states that the

supplemental relief contemplated by statutory provisions such as subsection (3) of the Illinois Act is not limited to further declaratory relief, Burgard v. Mascoutah Lumber Co., supra, and that such further relief may include assessment of damages or other affirmative relief obtainable by petition in the same action and in the same court in which the declaratory relief was obtained. Anderson, Declaratory Judgments, (2d ed., 1951, § 451)."

In *Burgard v. Mascoutah Lumber Co.* (1955), 6 Ill.App.2d 210, 127 N.E.2d 464, in affirming a money judgment entered for the defendant against the plaintiff in a declaratory judgment action, the Appellate Court for the Fourth District, at page 218, said:

"It is generally held that it is proper to award coercive relief after declaring the rights of the parties, including the entry of a money judgment. Tolle v. Struve, 124 Cal. App. 263, 12 P.2d 61; Alfred E. Joy Co. v. New Amsterdam Casualty Co., 98 Conn. 794, 120 Atl. 684; Holly Sugar Corp. v. Fritzler, 42 Wyo. 446, 296 Pac. 206."

To the same effect see *Crerar Clinch Coal Co. v. Board of Education* (1957), 13 Ill.App.2d 208, 218, 141 N.E.2d 393; *Greene v. Gust* (1960), 26 Ill.App.2d 2, 6, 167 N.E.2d 438; *Mundo v. DeGrazio* (1966), 77 Ill. App.2d 52, 222 N.E.2d 253 (abstract opinion).

We therefore hold that the trial court properly severed the trial as to basic liability from the trial as to how much the Hospital should recover.

## III.

This brings us to what we perceive to be the *third* issue—How much (in dollars) should the Hospital recover (by retention or otherwise) to compensate it for the expenses involved in the removal of the General Electric Textolite wall paneling and the installation in its place of the Westinghouse Micarta wall paneling?

■■ The defendants (putting aside for the present their several contentions that they are not liable at all) contend, *inter alia*, that the Hospital is not entitled to recover the extra cost of the more expensive Micarta paneling and the extra labor costs required by its more difficult installation, and that, insofar as such extra costs are included, the jury's verdict (and the court's judgment thereon) unjustly enriches the Hospital by giving it, free of charge, better and more expensive wall paneling than it had bargained for and thus puts it in a better position than it would have been had the original contracts been fully performed. We are of the considered opinion that this contention is well founded in this case.

In 22 Am. Jur. 2d *Damages* § 12 (1965), at 28, it is said:

"§ 12. Compensation as the general rule or objective. Compensation is the stated goal of courts in awarding damages for tortious injury or for breach of a contractual promise. With torts, compensation most often takes the form of putting the plaintiff in the same financial position he was in prior to the tort. With contracts, compensation is most often stated in terms of placing the plaintiff in the same financial position in which he would have been had the promise not been broken."

and, in section 13, at page 30, that:

"* * * The law will not put him in a better position than he would be in had the wrong not been done or the contract not been broken."

In 25 C.J.S. *Damages* § 74 (1966), at 846, 849, it is said:

"Compensation is the value of the performance of the contract; the person injured is, as far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed. * * *

On the other hand, the injured person is limited to the loss actually suffered by reason of the breach; he is not to be put in a better position by a recovery of damages for the breach than he would have been in if there had been performance."

Some of the many cases holding that the "injured party is limited to the loss actually suffered by reason of the breach and is not to be put in a better position by a recovery of damages for the breach than he would have been in had there been performance," are (chronologically): *Ciminelli v. Umland Brothers Inc.* (1932), 236 App. Div. 154, 258 N.Y.S. 143, 144; *Hennen v. Streeter* (1934), 55 Nev. 285, 31 P.2d 160, 163; *Lastinger v. City of Adel* (1943), 69 Ga. App. 535, 26 S.E.2d 158, 159; *Blair v. United States* (8th Cir. 1945), 150 F.2d 676; *Talbot-Quevereaux Const. Co. v. Tandy* (Mo. App. 1953), 260 S.W.2d 314, 316; *Ficara v. Belleau* (1954), 331 Mass. 80, 117 N.E.2d 287, 289; *Thorne v. White* (D.C. Mun. App. 1954), 103 A.2d 579, 580-81; *United Protective Workers v. Ford Motor Co.* (7th Cir. 1955), 223 F.2d 49, 53; *Western Oil & Fuel Co. v. Kemp* (8th cir. 1957), 245 F.2d 633, 644; *Wickman v. Opper* (1961), 188 Cal.App.2d 129, 10 Cal. Rptr. 291, 294; *Dehnart v. Waukesha Brewing Co.* (1963), 21 Wis.2d 583, 124 N.W.2d 664, 670; *Hendrie v. Board of County Commissioners* (1963), 153 Colo. 432, 387 P.2d 266, 271; *Richter Contracting Co. v. Continental Casualty Co.* (1964), 230 Cal.App.2d 491, 41 Cal. Rptr. 98, 107; *Hanz Trucking, Inc. v. Harris Brothers Co.* (1965), 29 Wis.2d 254, 138 N.W.2d 238, 246; *Oakwood Villa Apartments, Inc. v. Gulu* (1968), 9 Mich.App. 568, 157 N.W.2d 816; *Dierickx v. Vulcan Industries* (1968), 10 Mich.App. 67, 158 N.W.2d

778, 782; *Dewaay v. Muhr* (Iowa 1968), 160 N.W.2d 454, 459; *Boten v. Brecklein* (Mo. 1970), 452 S.W.2d 86, 93; *Mid-Continent Telephone Corp. v. Home Telephone Co.* (N.D. Miss. 1970), 319 F.Supp. 1176; *Crawford v. Associates, Inc. v. Groves-Keen, Inc.* (1972), 127 Ga. App. 646, 194 S.E.2d 499, 502; and *Louise Caroline Nursing Home, Inc. v. Dix Construction Corp.* (Mass. 1972), 285 N.E.2d 904.

Illinois follows this rule. In *Anderson v. Long Grove Country Club Estates* (1969), 111 Ill.App.2d 127, 249 N.E.2d 343, the Appellate Court for the Second District, through Mr. Justice Davis, at page 141, said:

> "The buyer also claims that the damages were excessive and that the seller got more under the judgment than he bargained for in his contract. We agree that the purpose of damages is to put the injured party in the position he would have been in had the contract been fully performed. 22 AmJur2d, Damages, §§ 45, 46. * * *"

Finally, let us examine one case in which the operative facts are very similar to those of the case here before us.

In *Henry J. Robb, Inc. v. Urdahl* (D.C. Mun. App. 1951), 78 A.2d 387, the appellant, owner of a garage, hired appellees, consulting engineers, to prepare plans and specifications for, and to supervise the installation of, a heating system sufficient in size and design to heat the building to a temperature of seventy degrees. Appellees prepared plans and specifications; bids based thereon were obtained; and a contract for the installation was awarded to Combustioneer Corporation at a cost of $4,602. The work was done by the contractor under appellees' supervision, but upon completion, it was found that the building was inadequately heated.

Investigation disclosed that in preparing the plans the appellees had made a mathematical error. To correct this, they prepared additional plans calling for three new heaters and the relocation of one. Appellant accepted these plans and authorized the contractor to do the work called for by them at a cost of $1,403. Appellant then sued appellee engineers for this sum, less $138.06, the balance due appellees on their agreed fee. Appellees filed a counterclaim for the balance of their agreed fee.

The trial court found that had the plans been correctly drawn originally the cost of the installation would have been $183.30 less than the total cost of the two jobs, due to an increase in costs of materials and labor between the dates of the original and final installations. Findings and judgments were entered for the appellant for $183.30 and for appellees for $138 on their counterclaim.

In affirming, the court, at pages 388-389, said:

> "Compensation is the basic principle of damages. For breach

of contract the injured party is entitled to be compensated for losses which are the natural consequence and proximate result of the breach. The purpose of such compensation is to place the injured party in as good a position as that in which full performance would have placed him. He is not entitled because of a breach to be put in a better position than he would have been had the contract been fully performed.

We have found no case squarely in point with the present one, but applying the general principles of damages above stated we conclude that the judgment of the trial court was correct. Appellees contracted to furnish plans for a heating system which would heat the building to seventy degrees. They did not contract to install the system or guarantee that the system could be installed for any specified sum. Appellees through negligence failed to furnish the proper plans, but when such negligence was discovered they supplied supplemental plans which together with the original plans fulfilled their contract obligation. Had the original plans been free from error the heating system would have cost appellant $183.30 less than was the cost by use of the original and supplemental plans. Thus appellees' error cost appellant $183.30 and appellees are liable for that amount. Such amount places appellant in the same position it would have been in if the error had not been committed. A larger sum would permit appellant to profit by appellees' mistake.

It is true that appellees' error caused appellant to believe and expect it would get the plant at a lesser price than it actually cost. But, without some special circumstances not here shown, the law does not provide compensation for disappointment over non-realization of a belief or expectation."

In order properly to apply the law as above outlined to the facts of this case, we must first determine what the Hospital would have received, insofar as wall paneling is concerned, had the basic contracts been fully performed in the first place.

The Hospital entered into a contract with Belli for all architectural and engineering services in connection with the design and erection of the new hospital, which provided that:

"The owner hereby engages the Architect to perform the following services: the preparation of preliminary studies and design drawings for the Hospital and the necessary conferences in connection therewith; the preparation of working drawings, specifications, large scale and full size detail drawings, for the Hospital; the structural and mechanical design for the contract drawings

and specifications; the drafting of forms of proposals for the several trades; the taking of bids and the preparation of contracts; the checking of shop drawings; the inspection of models; the issuance of certifications for payment; the keeping of accounts, the general administration of the business and the supervision of the construction of the Hospital, all of which is hereinafter referred to as the 'Work' ".

The contract further provided that:

"The plans, specifications and drawings will be prepared in such manner as will permit the application and submission of bids and the letting of contracts on a separate trades basis; that is to say, the Owner will not have one general contract for the construction of the Hospital in its entirety, but Architect will on behalf of Owner submit specific proposals to the separate trades and contracts will be executed by the separate trades directly with the Owner covering all of the work required to be performed and materials furnished for the construction of the Hospital. Part of the Work, as defined above, will be the supervision by Architect of the performance of these separate contracts."

The contract further provided that the Hospital, for said services, pay Belli 9½% of the cost of the work excluding certain costs such as sterilizers, lights, etc. This was in lieu of the 6 to 8% ordinarily charged by architects.

As a result, there was actually no general contractor having general supervision of the work, but Belli was to prepare and submit specific proposals to the separate trades and contracts were then to be executed between them and the Hospital, their performances being supervised by Belli.

Under this arrangement, bids were taken for the general construction of the hospital and Corbetta was awarded the contract for $6,011,910, later revised to $6,224,900.

This contract, *inter alia*, originally required Corbetta to furnish and install U.S. Plywood Corporation's "Novoply" plaster laminate veneered wall paneling, composed of resin-treated wood flakes and veneer particles, or approved equal, but, as is usual, provided that change orders could be made by Belli and, after approval by the Hospital, would be forwarded to Corbetta, which would then execute them.

In August of 1962, Belli prepared a "change order" requiring Corbetta to furnish and install, in lieu of said "Novoply" and at no increase in cost, General Electric's 5/16″ thick Batten Panel System, consisting of a textured patterned high-pressure laminated plastic base (Textolite) on tempered hardboard with equivalent plastic laminate balancing sheet on

the back. This change order was approved in writing by Sister Vincent for the Hospital.

As subsequently developed, this "Textolite" wall paneling had a "flame spread" of 255, some 17 times the maximum set by the Chicago Building Code, and the only plastic laminate wall paneling then being manufactured which could have met the Code's maximum flame-spread requirement was Westinghouse's Micarta (asbestos), which eventually replaced the Textolite.

On October 26, 1962, General Electric and Corbetta entered into a subcontract under which General Electric was to furnish and install its said Textolite wall paneling in the Hospital but this was revised to provide that Corbetta install the paneling as subcontractor of General Electric.

The actual installation of the Textolite began in September of 1963 and was completed 7 months later in the latter part of March or the early part of April, 1964, and on April 17, 1964, the "change over" from the old hospital to the new one took place.

Summarizing the foregoing, under the contracts involved, the Hospital was, insofar as wall paneling is concerned, entitled to have Belli use its best professional skill in selecting a wall paneling meeting, among other criteria, the Chicago Building Code's maximum flame spread rating of 15. There is no real doubt that Belli should originally have specified Westinghouse's Micarta asbestos wall paneling which was the only plastic laminate wall paneling which met the flame spread standard set by the Chicago Building Code.

But had Belli so complied with its contract, the Hospital would have had to pay not the relatively modest cost of the Textolite wall paneling material, and the costs of its relatively simple installation, but the greatly increased cost of the Micarta asbestos paneling, plus the greatly increased costs of its more difficult installation. And, as Sister Vincent (the administrator of the Hospital during the construction, who signed the order requiring the change from "Novoply" to "Textolite" on behalf of the Hospital) testified, she would have signed a change order specifying a plastic laminate wall covering which cost more "if it was necessary to comply with the Code."

Certainly the Hospital should not receive, without paying more than it originally had agreed to pay for the Textolite, a windfall in the form of the more expensive Micarta paneling and the extra labor costs required by its more difficult installation, merely because its architect initially failed to specify it. The same applies to the door stops, solid core doors and hardware and their installation, which were necessary

and were furnished in the reconstruction but were not included in Belli's original plans and specifications.

Excluding the $112,770.55 attorneys' fees, the jury's verdict was for $319,519.34, being the total of two items, $297,479.86 paid by the Hospital to H. B. Barnard & Co., for the removal and reconstruction, and $22,039.48 ($23,199.45, less 5% of the sum paid to Schmidt, Garden & Erickson) paid for architectural services in connection with the same.

Applying the law as above outlined to the facts of this case, the jury's verdict is utterly unsupported by and contrary to the undisputed evidence to the extent of $116,484, as shown by the following.

Micarta paneling (which, due to savings resulting from increased production, had not increased in cost since 1963) would have cost $106,000 in 1963. The Textolite paneling, installed and later removed, cost $58,000 in 1963 ($87,000 less one-third for paneling not removed.) On this alone the Hospital is ahead $48,000.

The Micarta, being much harder and more expensive to install than the Textolite, would have cost $80,000 to install in 1963 (the actual cost of installation of $107,750 was a 30% increase over 1963). The Textolite cost $33,000 to install in 1963. On this, the Hospital is ahead another $47,000.

To this add door stops $4,298, solid core doors and hardware $8,811 and installation of $8,375 (which were not originally specified or installed but were added at the time the paneling was replaced) for a subtotal of $21,484.

These three items total $116,484, and we therefore will reduce the sum the Hospital is entitled to recover (by retention or otherwise) by this amount.

## IV.

This brings us to what we perceive to be the *fourth* issue—Which defendants, if any, are liable to the Hospital for the damages above described? This we shall break down into three subdivisions—Belli, Corbetta and General Electric.

(a) *Belli*

In Section V of Belli's brief it contends, in substance, that it committed no tort and did not breach its contract with the Hospital to design and supervise the construction of the new hospital, and that it "in the normal course of such supervision ascertained that the General Electric Batten Panel System designated in its change order number G-33 would have to be replaced. This is not any unusual situation."

The evidence in this case establishes that Belli not only was legally

required to know but did in fact know that the Chicago Building Code required that paneling installed in such building have a "flame spread" rating of not to exceed 15; that Belli specified General Electric's "Textolite" paneling without making any investigation whatsoever to determine whether or not it met that standard; that during the 7 months it took to install the Textolite no one at Belli discovered that said material had a flame spread 17 times the maximum and could not possibly be installed upon the walls of any hospital in Chicago; that Belli therefore made a gross error in specifying it in said change order; and that it was only the insistence of the building inspector that a certificate be filed that uncovered the fact that on one had ever bothered to procure the consent of the building department to change order G-33 as issued to Corbetta.

According to Belli's brief, this was "commonplace practice" and should somehow be excused because, after the discovery of Belli's error, it refused to issue an architect's certificate certifying that Corbetta had properly completed its work, thus holding up the final payment to Corbetta. No cases are cited in support of this theory.

In *Straus v. Buchman* (1904), 96 App. Div. 270, 89 N.Y. S. 226, the plaintiff purchased a partially completed building and employed the defendants as architects to superintend and supervise the remainder of the work to be performed thereon. At the time of the purchase, a change in the plans of the building, of which the defendants were fully advised, was agreed upon between the plaintiff and his vendor, the change requiring a new support for certain tail beams. These the architects permitted to be rested on studding partitions, contrary to the requirements of a statute applicable to buildings at that place. The building when completed proved to be defective, and the plaintiff sued the defendants for his damages. In holding the defendants liable, the court said:

> "* * * The placing of these timbers, and the manner in which they were secured, was not only a serious defect, but a direct violation of the statute in force at that time relating to the construction of buildings in the city of New York (section 476, c. 275, p. 547, Laws 1892), which provided that 'in no case shall either end of a beam or beams rest on stud partitions.' It was the duty of the defendants, under their contract with plaintiff, not only to see that the beams were properly placed, but especially to see that the placing of them conformed to the requirements of the statute. This they failed to do." 96 App.Div. at 273-74, 89 N.Y.S. at 229.

In *Nave v. McGrane* (1910), 19 Idaho 111, 113 P.82, the plaintiff, an

architect, sued to recover for his services in drawing plans for a building which the defendant contemplated constructing. At the trial it was shown that the building as designed by the architect violated the building ordinances of the city where the building was intended to be erected. It was held that the architect could not recover, the court saying:

> "So far as an architect is concerned, there is always an implied contract that the work shall be suitable and capable of being used for the purpose for which it is prepared. Apart from questions of public policy, this principle would prevent him from recovering upon plans and specifications prepared in violation of law, unless he was directed to so prepare them by the owner." 19 Idaho at 128-29, 113 P. at 88.

In *Scott v. Potomac Insurance Co.* (1959), 217 Ore. 323, 341 P.2d 1083, an architect specified improper material (metal tubing), without ascertaining its suitability. In holding the architect liable, the court said:

> "It ill behooves a man professing professional skill to say I know nothing of an article which I am called upon to use in the practice of my profession." 217 Ore. at 334, 341 P.2d at 1088.

In 12 Vand. L. Rev. 711 (1959), in an article by Prof. George M. Bell entitled "Professional Negligence of Architects and Engineers," it is said, at pages 715-716, under the subtitle "Liability to the Owner for a Defective building":

> "Architects and engineers hold themselves out as competent to produce work requiring: (a) skill in the preparation of plans, drawings or designs suitable for the particular work to be executed; (b) knowledge of the materials to be used and the proper application for use; (c) knowledge of construction methods and procedures. Presumably, if the architect or engineer fails to use reasonable care to produce a satisfactory structure, he may be sued either for a breach of an implied term of his contract or in negligence.  *  *  *"

Nor can Belli avoid liability on the ground that, by refusing to issue a final certificate for payment after its error had been discovered, enough money was withheld from Corbetta to cover the loss. As we shall subsequently demonstrate, Corbetta was not itself at fault and payment to it was wrongfully withheld. The error in specifying Textolite was that of Belli; not Corbetta.

■■ We therefore must and do hold that, although others may also be at fault, Belli, which, as architect, specified the Textolite paneling without ascertaining its flame spread rating, and permitted its installation over a period of some 7 months, is liable to the Hospital for the damages proximately flowing therefrom. We therefore conclude that the

jury's verdict for the Hospital and against Belli as to liability was and is correct and approve that verdict.

(b) *Corbetta*

Corbetta opens its argument that it is not liable for damages flowing from its installation of the very paneling specified in change order G-33 as follows:

> "Despite the 5,000 page record, the central issue is a simple one: When an owner, through its agent architect, directs the contractor to install certain material, does not the owner impliedly warrant to the contractor that the material is suitable?"

Not only Corbetta but the other parties seem to have overlooked the fact that said change order was signed not only by Belli, as the Hospital's architect, but by the Hospital itself in the person of Sister Vincent, its administrator, so that Corbetta's said initial inquiry could better have been worded as follows:

> "Where an owner, through its architect and the Sister who administered the hospital, issued a change order which specified that a particular material be installed, does not such owner warrant that said material is suitable?"

In 6 Corbin on Contracts § 1338 at 394 (1962), it is said:

> "If the destruction of the partly completed structure or the defects in it when completed are caused by the representations of the owner on which the contractor reasonably relied, or by defects in plans and specifications supplied by the owner which the contractor was required to follow, the contractor will not be liable in damages for nonperformance and will not be denied a judgment for compensation. In such a case the nonperformance is caused by the owner and is not a breach of contract."

and in 6 Williston, Contracts 5518 (rev. ed. 1938) it is said:

> "Though the builder may be liable if he fails, by reason of defective plans furnished him, to complete work which he has undertaken, yet if he can and does complete it according to the plans he is not liable for subsequent inferiority, injury, or destruction of the work, due to the defective character of the plans."

In 6 A.L.R. 3d, in an annotation entitled "Construction Contractor's Liability to Contractee for Defects or Insufficiency of Work Attributable to the Latter's Plans and Specifications," in § 2, at pages 1397-1398, it is said:

> "§ 2. *Rule that contractor is not liable*
>
> While a distinction between completed and uncompleted work with reference to the applicability of the rule has been drawn in a few jurisdictions, the rule has become well settled in practically

every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans or specifications furnished by the contractee, his architect, or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results, at least after the work is completed, solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects."

citing, *inter alia*:

"Ill—Clark v. Pope (1873) 70 Ill 128; Sperry v. Fanning (1875) 80 Ill 371; R. F. Conway Co. v. Chicago (1916) 274 Ill 369, 113 NE 703."

In *Clark,* our supreme court, at page 132, said:

"When it shall be established the building was constructed in a workmanlike manner, after the plans furnished, or, if there was any material deviation, it was made with the knowledge and consent of the committee, there would be no responsibility resting on the contractors, no matter from what cause it was destroyed, whether from its own inherent weakness in the mode of construction, or from the extraordinary violence of the storm. Their undertaking was simply to do the work with reasonable skill, after the designs furnished by the architects. They were not guarantors as to the strength of the edifice when finished, or its capacity to withstand the violence of the winds."

In *Conway,* in reversing the dismissal of a suit by a contractor against the city on a paving contract, where, because of faulty plans and specifications furnished by the city, the finished street proved to be unsatisfactory, our supreme court, at page 377, said:

"* * * The contract is not merely to do a particular thing but to do it in a particular way, using specified materials in accordance with the plans and specifications, which are to be the sole guide. The contractor had no discretion as to materials to be used or the manner in which the work was to be done. * * *"

Other Illinois cases to the same effect are: *MacRitchie v. City of Lake View* (1889), 30 Ill.App. 393, 398; *Ruddy v. McDonald* (1910), 244 Ill. 494, 498-499, 91 N.E. 651; *Woodley v. Zeman* (1913), 178 Ill.App. 369, 371.

To the same effect in other jurisdictions see *MacKnight Flintic Stone Co. v. Mayor* (1899), 160 N.Y. 72, 54 N.E. 661, 664; *Penn Bridge Co. v. City of New Orleans* (5th Cir. 1915), 222 F. 737, 742; *United States v. Spearin* (1918), 248 U.S. 132, 136, 63 L.Ed. 166, 39 S.Ct. 59; *Ham-*

*maker v. Schleigh* (1929), 157 Md. 652, 147 A. 790, 795; *Trustees of the First Baptist Church v. McElroy* (1955), 223 Miss. 327, 78 So. 2d 138; and *Corporation of Presiding Bishop v. Cavanaugh* (1963), 217 Cal. App.2d 492, 32 Cal. Rptr. 144, 153.

In passing, we should mention Corbetta's argument that Belli, under the contract in this case, was the Hospital's "exclusive agent," whose acts, at least as between the Hospital and Corbetta, were binding upon the Hospital. While we fully agree with this contention, it is really not necessary to reach it, first, because the Hospital's administrator Sister Vincent herself also signed the change order; and, second, because, in most of the cases above cited, the defective plans and specifications causing the difficulty were issued by the owner's architect, not the owner, and yet the court in such cases held that the owner was bound and that the contractor who followed them was not liable to the owner.

■■ Unless other considerations are here present sufficient to alter our thinking, the foregoing would lead us to conclude that the answer to Corbetta's said inquiry is "yes" and that it is not liable for the damages flowing from its having installed the precise material specified in change order G-33, signed by the Hospital's architect Belli and by the Hospital's then Administrator, Sister Vincent.

The Hospital contends, however, that a different result should prevail here because the agreement between it and Corbetta contained the following provisions:

"Article 4. Contractor further agrees to save and hold harmless Owner and Architect of, from and against any and all losses, damages, costs and expenses including court costs and attorneys' fees incurred and paid by Owner and Architect, or either of them arising out of, or in connection with any and all acts or omissions of Contractor, any subcontractors of Contractor and all employees, representatives and agents of Contractor and subcontractors. ⁕ ⁕ ⁕

Article 5. Contractor agrees to guarantee his work against all defects in materials and workmanship for a period of two years from date of completion as evidenced by the issuance of the final Architect's Certificate."

The flaw in this contention is that what the Hospital is in reality urging is that the above quoted language be construed to require Corbetta to indemnify it (and Belli) against the proximate results of what it (and Belli) had expressly and precisely ordered Corbetta to do— viz.: to install General Electric's Textolite wall paneling on the walls and corridors of the hospital. All that Corbetta did was to carry out that explicit order.

To require Corbetta to indemnify the Hospital and Belli for doing what they precisely had ordered it to do would in our opinion, be even more unfair than to hold that Corbetta must, on the basis of the above quoted language, indemnify the Hospital (and Belli) for their own mere negligence.

But it is the law in Illinois that an indemnity contract will not be construed as indemnifying one against his own negligence unless such a construction is required by clear and explicit language of the contract.

The basic Illinois case in this area is *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.* (1947), 395 Ill. 429, 70 N.E.2d 604, where our supreme court, at pages 433-434, said:

> "It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language in the contract, (*Sinclair Oil Co. v. Thornley,* 127 Fed. 2d 128; *Doughnut Machine Corp. v. Bibbey,* 65 Fed. 2d 634,) or such intention is expressed in unequivocal terms. *Thompson-Starrett Co. v. Otis Elevator Co.* 271 N.Y. 36, 2 N.E.2d 35; *Employers Liability Assur. Corp. Ltd. of London Eng. v. New York Linen Supply & Laundry Co.* 239 N.Y. 560, 147 N.E. 195; *Manhattan Railway Co. v. Cornell,* 54 Hun. 292, 7 N.Y.S. 557, *affirmed* in 130 N.Y. 637, 29 N.E. 151."

In *Mesker Bros. Iron Co. v. Des Lauriers Column Mold Co.* (1972), 8 Ill.App.3d 113, 289 N.E.2d 223, this court, after citing and quoting from *Westinghouse,* at page 116, concluded as follows:

> "Defendant correctly points out that to enforce the indemnity clause as plaintiff suggests would make defendant responsible even for plaintiff's total failure to perform under its contract with F & S. Therefore, we hold that unless the terms of the indemnity clause clearly provide that a sub-contractor is to assume the risk of negligent manufacture of materials supplied by his contractor, the indemnity clause should not be construed to include such a risk. The damage here resulted not from any negligence in the installation of the materials, but the defective manufacture of such materials by the plaintiff, and since the clause in question does not expressly provide that defendant is to assume such risk, the plaintiff is not entitled to indemnification for the resultant damage."

In *Tatar v. Maxon Construction Co.* (1973), 54 Ill.2d 64, 294 N.E.2d 272, in affirming a judgment that no indemnity was provided, our supreme court, at pages 67-68, said:

> "The leading case in this jurisdiction on the question involved

here is *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.*, 395 Ill. 429, in which the court said at page 432: 'It is a general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used; and the courts will not, because a more equitable result might be reached thereby, construe into the contract provisions that are not therein.' The court further said, 'It is quite generally held that an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract [citations], or such intention is expressed in unequivocal terms.' 395 Ill. at 433.

We have examined the authorities cited by the parties and many of those collected at 27 A.L.R.3d 663, and conclude that the contractual provisions involved are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions.

The indemnity agreement provides that Freesen will indemnify Maxon 'against all expenses, claims, suits, or judgments of every kind whatsoever * * * by reason of, arising out of, or connected with, accidents, injuries, or damages, which may occur upon or about the Subcontractor's work.' The provision for insurance requires Freesen to maintain policies 'such as will protect the Subcontractor, the General Contractor * * * from claims for damage to property, and injury to persons, * * * which may arise out of Subcontractor's work.' Although the indemnity agreement is clearly intended to be less restrictive than the provision for liability insurance, we conclude that when measured against the standards set forth in *Westinghouse*, it does not, under the circumstances alleged in the pleadings, provide indemnity against claims arising out of Maxon's own negligence, and the judgment of the appellate court is, accordingly, affirmed."

And in *Hulse v. Midwest Emery Freight Systems. Inc.* (1973), 12 Ill. App.3d 316, 299 N.E.2d 24, the Appellate Court for the Fourth District, in reversing a judgment that the express indemnity constituted an undertaking to indemnify against a party's own negligence, at page 318, said:

"If, as is argued, the contract terms constitute a hold harmless

agreement or an exculpatory agreement, the same result obtains. In *Tatar v. Maxon Construction Co., Inc.*, 3 Ill.App.3d 352, 277 N.E.2d 715, *aff'd.* 54 Ill.2d 64, 294 N.E.2d 272, we observed that exculpatory clauses in contracts or language in contracts whereby a tort feasor seeks to excuse or transfer liability for his own wrongful or tortious act were not favored and such would be strictly construed. The operative language in this agreement under such construction does not obligate the plaintiff to pay for damages to the trailer occasioned by the defendant. Rather, the contract language relates to the obligation of the defendant to pay routine costs and damage to the equipment. Such cannot be construed as to be an undertaking by the plaintiff to exculpate the defendant from its own tortious conduct nor intentionally inflicted damage. (See *Leach v. Eychaner*, 1 Ill.App.3d 327, 273 N.E.2d 55; *Moss v. Hunding*, 27 Ill.App.2d 189, 169 N.E.2d 396.) * * *"

Viewing the language above quoted from Articles 4 and 5 of the contract between the Hospital and Corbetta in the light of these cases, we conclude that they do not make Corbetta liable to the Hospital (or to Belli) for the disastrous eventual results of Corbetta's installing on the walls of the hospital precisely what the Hospital (and Belli) had ordered it to install.

■■ The Hospital also contends that a difficult result should obtain here because Article 12 of the contract between it and Corbetta (quoting from the Hospital's brief) required Corbetta:

"to comply with all ordinances, codes, etc., and to be responsible to plaintiff for all damages caused by violation of any such codes."

This is in substance but another version of its earlier contention that the quoted language requires Corbetta to indemnify the Hospital for damages proximately flowing from Corbetta's doing precisely what the Hospital (and Belli) had ordered it to do. We do not so construe said language.

Furthermore all parties (including the Hospital) are legally subject to such codes and, as the Hospital's own brief well puts it: "Ignorance of the law excuses no one."

■■ The Hospital also argues that a different result should prevail here because, in January of 1963, before the installation, Mr. Derbyshire of General Electric wrote Mr. Egidi of Corbetta that its Batten Panel System "did not carry a flame spread rating of any kind" and that "we can supply a UL flame spread panel but not on the terms and drawings submitted in connection with the contract."

In the first place, General Electric did not, at that time (or now), have a paneling which met the maximum of 15 set in the Chicago

Code. In the second place, information to the effect that General Electric's Batten Paneling Sysem did "not carry a flame spread rating of any kind" was nothing new in that all of the parties, including the Hospital and its architect Belli, had long known that, and Belli had already taken the position that this was of no concern to anyone other than himself and that the plans for the hospital had already been approved by the city. Had General Electric in said letter warned Corbetta and the others (as was the fact) that said paneling had a flame spread rating some 17 times that permitted under the Code, a far different issue would have been here presented.

We therefore conclude that Corbetta is, as a matter of law, not liable for such damages as here flowed from its having installed on the walls of the hospital the precise paneling specified in change order G-33 signed by Belli, the Hospital's architect, and by Sister Vincent, its administrator. We therefore set aside the jury's verdict to the contrary.

(c) *General Electric*

General Electric opens its argument that it is not liable for the damages flowing from Corbetta's installation of General Electric's "Textolite" paneling on the walls of the hospital in the following language:

"* * * It is the position of GE that the Hospital was not a third party beneficiary of its contract with Corbetta. But even if the Hospital was a third party beneficiary, it is still not entitled to any recovery since GE did not breach its contract with Corbetta but, rather, in accordance with the contract, it gave notice that its batten panel system was fire rated and that if a flame spread rated system was required the project would have to be reengineered and repriced.

If GE is held to be liable to the Hospital it is still not entitled to judgment since it suffered no damages because the amount withheld by the Hospital under its contract with Corbetta more than covered the costs of the removal and replacement of the GE paneling. * * *"

Disposing of the last contention first, it is without merit in this case inasmuch as we have heretofore held that Corbetta is not liable for any of the Hospital's damages and, as we shall hereinafter demonstrate, is therefore entitled to recover that "hold back," from the Hospital.

We do not reach or decide whether the Hospital is or is not a third-party beneficiary, in the traditional *Lawrence v. Fox* sense of the contract between General Electric and Corbetta. Although the contention and the Hospital's response thereto are interesting and ingenious, we prefer, instead, to base our holding that General Electric is liable to the Hospital on other grounds.

Over and over, both in the trial court and in its brief and argument here, General Electric reiterates that:

"We warned the parties involved that Textolite was not rated."

On August 28, 1962, a series of flame spread tests were made at the Underwriters Laboratories in Northbrook. Herbert Day, an employee of General Electric, was there. The tests were performed by Walter Haas of Underwriters and seven different products were tested. General Electric's product Textolite (the same as was here installed) was placed in one of the tunnels and the fire turned on. The test lasted only 2 minutes and 16 seconds because by then the flames had traversed the entire (25 feet) length of the tunnel and the sample of Textolite was removed with its surface completely charred. That concluded the test and the flame spread was calculated at 254.6 or 255. The Textolite had the highest flame-spread rating of any of the products tested that day.

On August 31, 1962, Day reported to General Electric by a letter addressed to Mr. Thomas, with copies to Mr. Derbyshire of General Electric, and others. Haas, of Underwriters, explained the nature of the test and the result of the test on Textolite and said that the product was not given a flame-spread rating because they felt that no product testing out over 200 should be given a rating because it would be highly inflammable and dangerous.

On October 26, 1962, 2 months after said test, General Electric entered into its subcontract with Corbetta for the installation of this highly inflammable material on the walls of the plaintiff's hospital in Chicago. No one other than General Electric knew at that time of the disastrous results of this test.

In December of 1962, representatives of General Electric, including Derbyshire, and of Corbetta met and discussed further the installation of Textolite in the plaintiff's hospital. Again, Derbyshire said nothing of the results of said test to Corbetta's representatives, or even to Warner, his own salesman.

On January 3, 1963, Derbyshire wrote Mr. Egidi, of Corbetta, as follows:

"Further at this time I wish to point out that our Batten Panel System does not carry a flame spread rating of any kind. I have brought up the need of a fire rating of this System in several of our initial discussions and again on December 12, 1962. I have been told that it was none of our concern and that everything was taken care of in this respect. Nowhere is a rating mentioned in the specification. If we now find that our System must have a flame spread rating, then our contracted price no longer can

apply. We must at this point reevaluate the requirements and re-engineer the paneling and pricing accordingly.

We can supply a U-L flame spread rated panel but not under the terms and drawings submitted in conjunction with the contract."

It should be noted that, again, the fact that the Textolite paneling had actually been flame tested and had tested out a disastrous 17 times the maximum permitted under the Code is masked and concealed. Rather, it was a "coverup." Furthermore, General Electric did not then have (nor has it had since) a wall paneling meeting the flame-spread test fixed in the Chicago Code.

Since, as the letter on its face recites, the lack of a flame-spread rating was "old stuff" and the architect Belli had already told the others it was none of their concern and that everything had been taken care of, Egidi did nothing about it and General Electric drew up the plans and specifications and the project went on to completion. The actual installation of the Textolite took place from September of 1963 to April of 1964. During these 7 months, the same H. P. Thomas of General Electric, to whom Mr. Day's report concerning the disastrous result of the Underwriters Laboratory test of August 28, 1962, had been directed, was on the job daily supervising the installation of the same Textolite covered by that report. But during that period, neither Thomas nor Derbyshire ever mentioned to any of the others here involved the results of that test. The results of that test were not disclosed to others until April of 1964, after the installation had been completed.

In view of these facts, we agree, as it said in plaintiff's (and Corbetta's) brief, that:

"Regardless of how many times General Electric might say, either orally or in writing, that 'Our material is not flame rated,' the statement is still a 'gross deception' covering up the real truth namely that General Electric was proposing for installation in this hospital a material which it actually knew was utterly unfit for use in such an institution."

Under these facts, we are of the considered opinion that General Electric is liable to the Hospital on the basis of fraud and deceit in not disclosing that its said paneling had actually been tested by Underwriters Laboratory and had been found to have a flame spread 17 times the maximum under the Chicago Building Code; which theory does not require privity in the traditional sense.

(i)

It is well established that a statement which is technically true as

far as it goes may nevertheless be fraudulent, where it is misleading because it does not state matters which materially qualify the statement as made. In other words, a half-truth is sometimes more misleading than an outright lie.

In 37 Am. Jur. 2d *Fraud and Deceit* § 183 (1968), it is said, at page 246:

> "* * * It is an old adage that half a truth is a lie. Thus, a statement which is technically true in fact as far as it goes may also be fraudulent, where it is misleading because it does not include all the material facts."

In 37 C.J.S. *Fraud* § 16 (1943), it is said, at page 247:

> "* * * One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes. Such concealment is in effect a false representation that what is disclosed is the whole truth."

To the same effect, see Prosser's Handbook on the Law of Torts (4th ed. 1971) § 106, at 695-696; Harper and James, Law of Torts §§ 7.13, 7.14, at 585-587 (1956); Restatement of Torts § 529, at 67 (1938); 19 I.L.P. *Fraud* § 11, at 570 (1956).

For cases so holding (chronologically arranged), see *Newell v. Randall* (1884), 32 Minn. 171, 19 N.W. 972, 973; *Equitable Co. v. Halsey Stuart & Co.* (1941), 312 U.S. 410, 425-426, 61 S.Ct. 623, 85 L.Ed. 920; *Parker v. Title & Trust Co.* (9th Cir. 1956), 233 F.2d 505, 510-511; *Mid-States Insurance Co. v. American Fidelity & Casualty Co.* (9th Cir. 1956), 234 F.2d 721, 729; *Harkins v. Fielder* (1957), 150 Cal.App.2d 528, 310 P. 2d 423, 429; *Doran v. Milland Development Company* (1958), 159 Cal.App.2d 322, 323 P. 2d 792; *M. G. Chamberlain & Company v. Simpson* (1959), 173 Cal.App.2d 263, 343 P. 2d 438, 446; *Gerstle v. Gamble-Skogmo, Inc.* (E.D.N.Y. 1969), 298 F. Supp. 66, 95; *Elizaga v. Kaiser Foundation Hospitals, Inc.* (1971), 259 Ore. 542, 487 P.2d 870; *McGlothlin v. Nichoalds* (D.C. Colo. 1962), 212 F. Supp. 757, 761; *Krause v. Eugene Dodge, Inc.* (1973), —— Ore. ——, 509 P. 2d 1199, 1208.

### (ii)

It is also well established that where one has made a statement which at that time is true but subsequently acquires new information which makes it untrue or misleading, he must disclose such information to anyone whom he knows to be acting on the basis of the original statement—or be guilty of fraud or deceit.

In 37 Am. Jur. *Fraud and Deceit* § 184 (1968), it is said, at page 247:

"* * * One who knows that a statement true when made has become false has a duty to disclose the changed conditions to the representee before he acts on it. * * *"

In 37 C.J.S. *Fraud* (1943), it is said, in section 16, at page 245:

"*Representations subsequently found false by maker.* One making a representation which he believed to be true, but subsequently found to be false, is liable in fraud for failure to correct the statement, unless he did not discover its falsity until after the bearer had acted thereon."

To the same effect see Prosser's Handbook on the Law of Torts § 106, at 696-697 (4th ed. 1971); Harper and James, Law of Torts § 7.14, at 589 (1956); Restatement of Torts § 551, at 117-118 (1938); 19 I.L.P. *Fraud* § 11, at 570 (1956).

For cases so holding (chronologically arranged), see: *Loewer v. Harris* (2d Cir. 1893), 57 F. 368, 373; *Porter v. Beattie* (1894), 88 Wis. 22, 59 N.W. 499, 503; *Chilson v. Houston* (1900), 9 N.D. 498, 84 N.W. 354, 356; *Holt v. King* (1903), 54 W.Va. 441, 47 S.E. 362, 365; *Atlas Shoe Co. v. Bechard* (1906), 102 Me. 197, 66 A. 390, 393; *Noble v. Renner* (1916), 177 Iowa 509, 159 N.W. 214, 216; *Maxwell Ice Co. v. Brackett, Shaw & Lunt Co.* (1921), 80 N.H. 236, 116 A. 34, 36; *Fruit Dispatch Co. v. Wolman* (1925), 124 Me. 355, 128 A. 740; *Hush v. Reaugh* (E.D. Ill. 1938), 23 F. Supp. 646, 652; *Koch v. Williams* (1961), 193 Cal.App.2d 537, 14 Cal. Rptr. 429, 431; *Guastella v. Wardell* (Miss. 1967), 198 So. 2d 227, 230; *Fischer v. Kletz* (S.D. N.Y. 1967), 266 F. Supp. 180, 188.

Illinois follows this line of cases. In *Rozny v. Marnul* (1969), 43 Ill.2d 54, 250 N.E.2d 656, our supreme court, citing *Fischer* (the last case above cited), at page 67, said:

"* * * The basis of liability in *Fischer* was defendant's failure to disclose after-acquired information which invalidated the accuracy of facts earlier certified to be correct. (Cf. *Drake v. Thor Power Tool Co.* (N.D. Ill. 1967), 282 F. Supp. 94.) * * *"

(iii)

■■ It is also well established that in fraud cases based on misrepresentation it is not a prerequisite to recovery that there be privity, at least in the traditional sense. It is enough that the statements by the defendant be made with the intention that it reach the plaintiff and influence his action and that it does reach him and that he does rely upon it, to his damage.

In Harper and James Law of Torts § 7.2 (4th ed. 1956), it is said at page 531:

"* * * Nor is it necessary that the misrepresentation be made by the defendant directly to the person or class of persons whom he intends to take action in reliance thereon. The misrepresentation may be made through a third person with the intention that it be repeated or passed on to one or more persons. * * *"

In 37 Am. Jur. 2d *Fraud and Deceit* § 190 (1968), it is said, at pages 252-253:

§ 190. Representations made directly or indirectly.

While some connection, direct or indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential, in support of a cause of action for damages resulting from false representations, that the false representations be shown to have been made directly to the party claiming to have relied upon them. It has been repeatedly held that where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statements for the damages resulting from the fraud. Such holdings conform to the principle that the rule that representations must have been intended to influence the complaining party is equally applicable whether they are made to him directly or indirectly. * * *"

To the same effect, see Restatement of Torts § 533 at 77 (1938); 19 I.L.P. *Fraud* § 17, at 581-582 (1956).

For cases so holding (chronologically arranged), see *Nathanson v. Murphy* (1955), 132 Cal. App. 2d 363, 282 P.2d 174, 178; *Simone v. McKee* (1956), 142 Cal. App. 2d 307, 298 P. 2d 667, 671-672; *Odell v. Frueth* (1956), 146 Cal. App 2d 504, 304 P. 2d 45, 48-49; *Harkins v. Fielder* (1957), 150 Cal. App. 2d 528, 310 P. 2d 423, 429; *Granberg v. Turnham* (1958), 166 Cal. Supp. 2d. 390, 333 P. 2d 423, 428; *Harold v. Pugh* (1959), 174 Cal. App. 2d. 617, 345 P. 2d 112, 115; *Massei v. Lettunich* (1967), 248 Cal. App. 2d 68, 56 Cal. Rptr. 232, 235.

Illinois follows this line of cases. In *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656, a judgment was entered against the defendant Marnul who had prepared a land survey for a real estate developer, who sold the property to a builder from whom the plaintiffs purchased the improved property. The survey was passed on to a savings and loan association where the plaintiffs saw and relied on it in making the purchase, as did the savings and loan in making the loan. The survey was inaccurate and, as a result, the plaintiffs' house and garage had to be

relocated, at a cost of $13,350. In affirming the judgment of the trial court, even though there was no privity in the traditional sense, our supreme court, at pages 61-62 and 67, said:

"Section 402B and a parallel rule relating to pecuniary loss were adopted by the Tennessee Supreme Court in the recent case of *Ford Motor Co. v. Lonon*, 217 Tenn. 400, 398 S.W.2d 240. After stating that 'the decision in the present case is based upon the ground that the manufacturer has committed the tort of misrepresentation rather than a breach of warranty * * *' the court noted that it was not necessary to deal with the privity requirement traditional in contractual warranty cases. 'Where * * * plaintiff can establish representations to the public, justifiable reliance on these representations, and the other matters necessary to bring his case under the rules developed in 2 Restatement (Second) Torts, § 402B and a parallel rule concerning pecuniary loss we consider that recovery is justified, both for physical and pecuniary loss, on grounds of misrepresentation, even though there is no direct contract relationship between the parties.' 398 S.W.2d at 248.

This process of adhering to or eliminating the privity requirement has proved to be an unsatisfactory method of establishing the scope of tort liability to third persons. Because of the difficulties in applying the rule, courts created exceptions deemed necessary to achieve desirable results which were not always completely reconcilable. (See *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873, 878.) To eliminate any uncertainty still remaining after *Suvada v. White Motor Co.*, 32 Ill.2d 612, 617, we emphasize that lack of direct contractual relationship between the parties is not a defense in a tort action in this jurisdiction. Thus, tort liability will henceforth be measured by the scope of the duty owed rather than the artificial concepts of privity.

* * *

In the case before us the fact that those who subsequently dealt with the property would rely on the plat was not only foreseeable, it was, by defendant's own testimony, known to him."

We therefore conclude that General Electric, under the facts of this case, is liable to the Hospital on the basis of fraud and deceit in not disclosing that its said paneling had actually been tested by the Underwriters Laboratory and had been found to have a flame spread 17 times the maximum under the Chicago Building Code. Not only did General Electric fail to advise the others of said change but, as it says again and

again in its current brief, it repeated its earlier (misleading) statement that its paneling "did not carry a flame spread rating of any kind."

A little plain honesty at this point on the part of Derbyshire of General Electric would have alerted the others to the red flag fact that its paneling could not possibly be used in any large hospital in Chicago.

We, therefore hold that the jury's verdict in favor of the Hospital and against General Electric as to liability was and is correct and affirm the verdict.

## V.

This brings us to what we perceive to be the *fifth* general problem—Are any of the defendants entitled to be indemnified by one or more of the other defendants, on the basis of express agreement or on an active-passive basis?

### Express Indemnities

As we have already demonstrated at some length, under IV (b) above, by the citation of and quotations from a number of Illinois cases, it is the law in Illinois that a contract will not be construed as indemnifying one against his own negligence (and by analogy, against the results of an act ordered by him) unless such a construction is required by clear and explicit language in the contract.

### Active-Passive

A recent case in this area is *Carver v. Grossman* (1973), 55 Ill.2d 507, 305 N.E.2d 161, where our supreme court, at pages 510-512, said:

> "Illinois has long adhered to the rule that there can be no contribution among joint tortfeasors. (See *Nelson v. Cook* (1856), 17 Ill. 443; *Johnson v. Chicago and Pacific Elevator Co.* (1882), 105 Ill. 462; *Skala v. Lehon* (1931), 343 Ill. 602; *Miller v. DeWitt* (1967), 37 Ill.2d 273.) The wisdom of the rule and the reason for its continuance have been severely questioned. (See *Sargent v. Interstate Bakeries, Inc.*, 86 Ill.App.2d 187; *Moroni v. Intrusion-Prepakt, Inc.*, 24 Ill.App.2d 534; Prosser, Handbook of the Law of Torts (4th ed. 1971), sec. 50.) Whether the time has arrived or conditions are ripe for a modification of this rule through judicial decision or legislative enactment is a question not relevant to a decision in this case. (For a discussion of legislative changes in the rule in other jurisdictions, see Prosser, Handbook of the Law of Torts (4th ed. 1971), sec. 50; see also, Uniform Contribution Among Tortfeasors Act (1955), 9 U.L.A. 1967 Pocket Part 127.) The theory of implied indemnity has been applied judicially to

mitigate the harsh effect that could result from an inflexible application of the rule which prohibits contributions. (*Muhlbauer v. Kruzel*, 39 Ill.2d 226, 230; see also *Gertz v. Campbell*, 55 Ill.2d 84.) We are called upon by the third-party complaint in this case to again apply the theory of implied indemnity.

This theory has been used to cover a variety of situations (see Feirich, Third-Party Practice, 1967 U. Ill. L. F. 236, 242). Where indemnity has been allowed the conduct of the indemnitor has usually been characterized as the primary cause or active negligence while that of the indemnitee has been characterized as the secondary cause or passive negligence. (*Chicago and Illinois Midland Ry. Co. v. Evans Construction Co.*, 32 Ill.2d 600.) In this case the third-party plaintiff, Grossman, has chosen to characterize the conduct of the third-party defendant, Bishop, as active negligence and that of the decedent, Putnam, whose estate he is administering, as passive negligence. Although these terms have not obtained precise judicial definition, previous decisions fairly well delineate the areas wherein conduct may be termed active or passive negligence.

Consideration must also be given to section 25(2) of the Civil Practice Act concerning third-party proceedings which states: 'Nothing herein * * * creates any substantive right to contribution among tortfeasors * * * which has not heretofore existed.' (Ill. Rev. Stat. 1969, ch. 110, par. 25(2).) In light of this statutory language and the general rule against contribution the facts of the case must clearly justify indemnification. If they do not, the net effect of the application of the implied indemnity theory will be not only to allow contribution but to permit the total shifting of responsibility to one negligent party while permitting the other to totally escape the responsibility for his negligent conduct."

In *Moody v. Chicago Transit Authority* (1974), 17 Ill.App.3d 113, 307 N.E.2d 789, this court, through Mr. Justice Goldberg, at page 117, stated:

"Determination of this question is not a matter of proceeding according to the usual dictionary definitions of the words 'active' and 'passive'. These words are terms of art and they must be applied in accordance with concepts worked out by courts of review upon a case by case basis. Under appropriate circumstances, inaction or passivity in the ordinary sense may well constitute the primary cause of a mishap or active negligence (*Topel v. Porter*, 95 Ill.App.2d 315, 330, 237 N.E.2d 711). It has been appropriately stated that 'mere motion does not define the distinction between

active and passive negligence.' (*Trzos v. Berman Leasing Co.*, 86 Ill.App.2d 176, 183, 229 N.E.2d 787.) In the case before us, we have reached the conclusion that the contentions advanced by each party against the other are equally valid and forceful and that both are guilty of active negligence. The contributions of both parties to cause the mishap were of equal significance. There is no 'qualitative distinction between the negligence of the two' counterclaimants. (See specially concurring opinion in *Gertz v. Campbell*, 55 Ill.2d 84, 93, 94, 302 N.E.2d 40.) The conduct of each was 'the primary cause or active negligence.'

It follows necessarily that neither Silvercup nor C.T.A. may have indemnification against the other. This principle has been expressed and repeated in a number of cases. See *Stewart v. Mister Softee of Illinois, Inc.*, 75 Ill.App.2d 328, 330, 221 N.E.2d 11. See also *Gillette v. Todd*, 106 Ill.App.2d 287, 294, 245 N.E.2d 923 cited in *Carver v. Grossman, supra*."

In applying these principles to the facts of this case, we shall, again, break our analysis down into three divisions, Belli, Corbetta and General Electric.

### For Belli
#### (a) *Against Corbetta*

Belli's contention that Corbetta expressly agreed to indemnify Belli (as architect) is based on Article IV in the contracts between Corbetta and the Hospital (Hospital Exs. 3 and 4) which provides as follows:

"Contractor further agrees to save and hold harmless Owner and Architect of, from and against any and all losses, damages, costs and expenses, including court costs and attorneys' fees, incurred and paid by owner or either of them, arising out of or in connection with any and all acts or omissions of contractor, any subcontractor of contractor and all employees, representatives and agents of contractor and subcontractors. The fact that any claim or suit may be made or filed against owner and architect or either of them without such claim or suit being made or filed against contractor or his subcontractors shall not affect the liability of contractor hereunder."

■■ Since we have already held that Corbetta, in furnishing and installing in the hospital precisely what Belli and the Hospital through Sister Vincent had ordered Corbetta to furnish and install did not breach any contract and was not guilty of any "omission," this provision, in view of the facts of this case and in the light of the authorities above cited and discussed, does not support Belli's contention. Here Belli is, in reality,

asking that Corbetta be required to indemnify Belli for its own careless-ness. Belli, not Corbetta, selected the Textolite wall paneling and we can perceive no just reason why Corbetta should have to bail it out. The same reasoning disposes of Belli's argument that Corbetta should be required to indemnify it on a active-passive basis.

### (b) *Against General Electric*

Belli makes no contention that General Electric expressly agreed to indemnify it and bases its entire argument on an active-passive theory.

Belli's argument would be far more convincing had Belli's Anthony Belli not repeatedly told Derbyshire of General Electric that flame spread was none of their concern.

Basically Belli is asking that General Electric be required to indemnify it for its own carelessness. We decline to do so. Here, it seems to us, the pot is calling the kettle black.

### *For Corbetta*

Since we have already held that Corbetta is not liable to the Hospital, Corbetta needs no indemnity.

### *For General Electric*
#### (a) *Against Belli*

■■ General Electric does not base its claim for indemnity against Belli on any express indemnity and bases its entire argument on an active-passive theory. Again (as in our discussion of Belli's claim for indemnity above), this is a case of a pot calling a kettle black. Here one who sold paneling which it knew was not in any possible way suit-able for use in a hospital and which concealed the intervening fact that said paneling had actually been tested by Underwriters Laboratory and found to be 17 times as flammable as the maximum under the Chicago Code, asks us to require the architects, who carelessly ordered it in-stalled in the hospital, to bail them out. We decline to do so.

#### (b) *Against Corbetta*

General Electric does not contend that Corbetta expressly agreed to indemnify it and bases its entire argument on an active-passive theory. Inasmuch as we have already held that Corbetta did nothing except to install what Belli and the Hospital had ordered it to install and is not liable for doing so, and have already held that General Electric not only impliedly warranted that its Textolite paneling was suitable for use in a large city hospital (which it was not) but was guilty of fraud and deceit in not revealing (as was the fact, known only to it) that said

paneling had actually been tested by Underwriters Laboratory and had been found to be 17 times as flammable as the Code permitted, we perceive no just reason why Corbetta should be required to bail General Electric out of the situation in which it now finds itself.

We therefore conclude and hold that no defendant was or is entitled to be indemnified by any other defendant on any basis, and we therefore affirm the trial court's holding to the same effect.

## VI.

This brings us to what we perceive to be the *sixth* main issue— Whether the Hospital is entitled to recover its attorneys' fees and expenses from any one or more of the defendants?

■■ One of the clearest statements of the Illinois law on this subject is found in *Ritter v. Ritter* (1943), 381 Ill. 549, 46 N.E.2d 41, where, in reversing a judgment for attorney's fees and expenses in favor of a successful litigant, our supreme court at page 553, said:

> "The rule is also well established that attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party in the absence of a statute, or in the absence of some agreement or stipulation specially authorizing the allowance thereof, and this rule applies equally in courts of law and in courts of equity. (*Constant v. Matteson, supra; Conwell v. Mc-McCowan, supra; Hutchinson v. Hutchinson, supra; Rasch v. Rasch,* 278 Ill. 261; *Kinane v. Fay,* 168 Atl. (N.J.) 724; *Weinhagen v. Hayes,* 190 N.W. (Wis.) 1002; *Day v. Woodworth,* 14 L.ed. 181.)"

To the same effect see 15 I.L.P. *Damages* § 62, at 398 (1968); 25 C.J.S. *Damages* § 50 (1966); and (chronologically arranged) *Constant v. Matteson* (1859), 22 Ill. 546, 560; *Conwell v. McCowan* (1870), 53 Ill. 363, 364; *Hutchinson v. Hutchinson* (1894), 152 Ill. 347, 355, 38 N.E. 926; *Washburne v. Burke* (1899), 84 Ill.App. 587, 589; *First National Bank v. Fidelity & Deposit Co.* (1902), 106 Ill.App. 367, 374; *Rasch v. Rasch* (1917), 278 Ill. 261, 275, 115 N.E. 871; *In re Estate of Riekan* (1926), 241 Ill.App. 235, 238; *Chicago Coliseum Club v. Dempsey* (1932), 265 Ill.App. 542, 552; *Boss v. Coe Investment Co.* (1964), 45 Ill.App.2d 417, 420-422, 195 N.E.2d 735; *People ex rel. Horwitz v. Canel* (1966), 34 Ill. 2d 306, 308, 215 N.E.2d 255; *Sentry Royalty Co. v. Craft* (1967), 79 Ill. App.2d 410, 420, 226 N.E.2d 282; *People ex rel. Henderson v. Redfern* (1968), 104 Ill.App.2d 132, 136, 243 N.E.2d 252; *House of Vision, Inc. v. Hiyane* (1969), 42 Ill.2d 45, 51-52, 245 N.E.2d 468; *Trustees of Schools v. Schroeder* (1972), 8 Ill.App.3d 122, 125-126, 289 N.E.2d 247.

Let us now apply these principles to the facts of this case, again break-

ing our discussion down into three subdivisions, Belli, Corbetta and General Electric.

## As Against Belli

■■■ The Hospital under the above authorities, has no claim for attorneys' fees and expenses against Belli because no contract between them even hinted at such an undertaking. No such fees or expenses were sought or allowed below or are sought here.

## As Against Corbetta

The Hospital's claim that Corbetta must reimburse it for its attorneys' fees and expenses is predicated upon Article 4 of Corbetta's contract (St. Joseph Ex. 2, liability trial), which provided as follows:

"Article 4. Contractor further agrees to save and hold harmless Owner and Architect of, from and against any and all losses, damages, costs and expenses, including court costs and attorney fees, incurred and paid by Owner and Architect or either of them, arising out of or in connection with any and all acts or omissions of Contractor, any subcontractors of Contractor * * *."

And upon paragraph 17e of the General Conditions page A-7, which, in pertinent part, provided as follows:

"In the event that litigation shall ensue as a result of a decision made by Architect hereunder, the costs and expenses of such litigation * * * shall be paid by the party whose position is not upheld."

The second provision (17e) above quoted obviously has nothing to do with the factual situation here involved.

In view of the fact that we have already held that Corbetta, in furnishing and installing in the Hospital precisely what Belli and the Hospital through its Sister Vincent had expressly ordered Corbetta to furnish and install, did not breach any contract and was not guilty of any "omission," these contractual provisions do not require Corbetta to reimburse the Hospital for its attorneys' fees and expenses. We therefore set aside the jury's verdict in this regard and reverse so much of the judgment as holds Corbetta liable to the Hospital for its attorneys' fees and expenses.

## As Against General Electric

■■ The Hospital's claim that General Electric must reimburse for its attorneys' fees and expenses is predicated upon Article 12(b) of the General Conditions (Hosp. Ex. 5), as incorporated by reference into the subcontract between Corbetta and General Electric. The said subcontract, in pertinent parts, provides as follows:

"You have read and are familiar with the principal contract, which is expressly made a part hereof, and the performance of this subcontract shall be subject to and in accordance therewith. A copy of the principal contract shall be kept at our office for reference.

\* \* \*

(e) You shall assume all such obligations towards us as we assume towards the owner under the principal contract relating to your work.

(f) You assume and shall hold the owner and us harmless from any liability, loss or expense, incurred because of your failure to follow and carry out this subcontract or the provisions of the principal contract applicable to your work, or because of your operations hereunder, or any act or omission by you, your employees, agents or subcontractors, in connection with or during such operations, \* \* \*."

Article 12(b) of the General Conditions, so incorporated, provides as follows:

"Each contractor shall give all notices and comply with all laws, ordinances, rules and regulations bearing on the conduct of his work. If the contractor observes that the drawings and specifications are in variance therewith, he shall promptly notify architect in writing and any necessary changes shall be adjusted as provided in the contract for changes in the work. If any contractor performs any work contrary to such laws, ordinances, rules and regulations, and without such notice to the architect, *he shall bear all costs, expenses, fines, penalties, including court costs and attorneys' fees arising therefrom*." (Emphasis supplied.)

It should be noted that said article not only requires each contractor to comply with all ordinances (which would certainly include the Chicago Building Code), but also provides that "if the contractor observes that the \* \* \* specifications are in variance therewith, he shall promptly notify architect in writing \* \* \*" and that "if any contractor performs any work contrary to such \* \* \* ordinances \* \* \* and without such notice to the architect, he shall bear all costs, expenses, \* \* \* including court costs and attorneys' fees arising therefrom."

On the record in this case, it is clear that General Electric not only furnished and installed paneling having a flame spread some 17 times the maximum permitted under the Code, but that, after an actual tunnel test by the Underwriters Laboratory had affirmatively disclosed to it that violation, it concealed that critical fact not only from the architect but

from everyone else (see our comments and conclusions under the *fourth* issue (fraud and deceit by General Electric) of this opinion, *supra*).

It therefore seems fitting and proper that General Electric should be required to reimburse the Hospital for its attorneys' fees and expenses in this case.

General Electric, however, contends, *inter alia*, that this does not follow here because paragraph (f) of the subcontract between Corbetta and General Electric fails itself to repeat the language of Article 12(b) relating to attorneys' fees and expenses, citing *Reed v. Long* (6th Cir. 1964), 327 F.2d 611. That case, which involved a contractor's claim for indemnity against his subcontractor for personal injuries suffered by an employee of the latter, is distinguished from the situation here before us and we are not convinced by it or by General Electric's argument that it is not bound by Article 12(b) of the General Conditions which plainly includes attorneys' fees.

■■ Nor are we impressed by General Electric's contention that the fees and expenses determined by the jury are excessive. We have reviewed the evidence and conclude that it sustains the jury's determination.

We therefore approve the jury's finding and affirm the judgment insofar as it requires General Electric to reimburse the Hospital for its attorneys' fees and expenses in the sum of $112,251.12.

## VII.

This brings us to what we perceive to be the *seventh* main problem— Is Corbetta now entitled to recover from the Hospital the funds withheld by it and, if so, must the Hospital also pay interest thereon?

In October of 1964, Corbetta applied for final payment under its contracts ($454,172.25, consisting of $322,402.05 on general construction and $121,770.20 for lathing and plastering), but the supervising architect (Anthony Belli) notified the Hospital that Corbetta should not be paid because it had not completed its work and that an architect's certificate could not be released.

From here on the hassle over who was responsible for the selection and installation of the Textolite wall paneling and who was to certify (falsely) that it met the Code provisions, continued to build up until the Hospital, faced with a threat by the city to shut down its operation and with a threat by Corbetta of a suit for the funds so held back, was forced to file the instant suit for declaratory judgment.

Corbetta's counterclaim for the funds so withheld ($454,172.25) was met by an answer by the Hospital which (par. 6) admitted that it had "refused to pay the balance due under the general construction contract

in the amount of $332,402.05" and that "it has withheld under the plastering and lathing contract the sum of $121,770.20" but went on to say that:

"It has withheld these sums because of the failure of COR-BETTA CONSTRUCTION CO., INC., BELLI & BELLI OF MISSOURI, INC., and GENERAL ELECTRIC COMPANY to fulfill the terms and conditions of their respective contracts, and because of the fact that the City of Chicago has refused to issue a license to ST. JOSEPH HOSPITAL to operate as a hospital in Chicago, Illinois, unless and until the defective wallboard is removed from the corridors and rooms of the hospital;  *   *   *."

■■ Inasmuch as the Textolite wall paneling referred to above has long since been removed and replaced with Micarta wall paneling which does comply with the Chicago Building Code and the Hospital has long since been licensed by the city to operate as a hospital and is doing so very successfully, and since we have already held (IV (b)) that Corbetta is, as a matter of law, not liable for such damages as here flowed from its having installed on the walls of the hospital the precise paneling specified in change order G-33 signed by Belli, the Hospital's architect and by Sister Vincent, its administrator, we conclude and hold that the Hospital must now pay such withheld sums over to Corbetta, with one possible exception.

As the trial court held, and as we subsequently hold in affirming the trial court in this regard, General Electric cannot recover from Corbetta the price (some $58,000) of the Textolite wall paneling later removed and replaced with Micarta paneling. If, as we suspect, the $332,402.05 which Corbetta says (and the Hospital admits) was sought by Corbetta and withheld by the Hospital includes the said $58,000, said sum should be deducted from the payment now due from the Hospital to Corbetta, since Corbetta has not and need not pay such sum to General Electric. Corbetta's counterclaim does not give enough details to enable us to determine this matter but it can, on remand, be quickly determined by the trial court, on motion for summary judgment on affidavits and (hopefully) without another jury trial.

This leaves the problem of whether the Hospital must also pay interest on the sums so withheld.

Corbetta opens its argument by quoting as follows from *Keeler v. Herr* (1895), 157 Ill. 57, 61, 41 N.E. 750, 751:

"*   *   *  If they were entitled to that price under the contract, the statute gave them the right to interest from the time the money became due, by the terms of the written agreement. * * *"

While *Keeler* did involve a building contract, that contract did not include (as does the one in the case at bar) any requirement that an

architect's certificate be furnished before the money became due and payable. For other Illinois cases in which no requirement of a certificate was involved and the court likewise innocuously held that interest accrued from the time when the money became due by the terms of the contract, see *Heiman v. Schroeder* (1874), 74 Ill. 158, 160; *Dobbins v. Higgins* (1875), 78 Ill. 440, 442; *Bauer v. Jerolman* (1906), 124 Ill.App. 151, 156-157; *Sanford Coal Co. v. Wisconsin Bridge & Iron Co.* (7th Cir. 1923), 293 F. 735, 737; *Smith v. Gray* (1925), 316 Ill. 488, 499, 147 N.E. 459. Cases also exist and are here cited where the contract did require an architect's certificate but such certificate either had been furnished or was waived by the owner's action, whereupon interest of course began to accrue at that time. See *Downey v. O'Donnell* (1879), 92 Ill. 559, 562-563; *McDonald v. Patterson & Co.* (1900), 186 Ill. 381, 386, 57 N.E. 1027; *Concord Apartment House Co. v. O'Brien* (1907), 228 Ill. 360, 373, 81 N.E. 1038; *Hood v. Community High School District No. 304* (1921), 223 Ill.App. 451, 454-455.

In the case at bar however, the contract, in pertinent parts, provided, in Articles 36, 37 and 38, as follows:

"ARTICLE 36. APPLICATIONS FOR PAYMENTS

A. Each Contractor must submit application for payment in triplicate on forms supplied by Architect. All blanks must be completed.

\* \* \*

ARTICLE 37. CERTIFICATES OF PAYMENT

A. If the Contractor has made application for payment as above described, the Architect shall, not later than the date when each payment falls due, issue to the Contractor a certificate for such amount as he decides to be properly due, or state in writing his reasons for withholding a certificate. Architect's certificates will be issued between the 5th and 10th day of each month.

\* \* \*

ARTICLE 38. PAYMENT WITHHELD

The Architect may withhold, or on account of subsequently discovered evidence, nullify the whole or a part of any certificate to such extent as may be necessary to protect the Owner from loss on account of:

A. Defective work not remedied.

B. Claims filed or reasonable evidence indicating probable filing of claims.

C. Failure of the Contractor to make payments properly to subcontractors or for material or labor.

D. A reasonable doubt that the contract can be completed for the balance then unpaid.

When the above grounds are removed, payment shall be made for amounts withheld because of them.

ARTICLE 53. CORRECTION OF WORK BEFORE
FINAL PAYMENT

A. Each Contractor shall promptly remove from the premises all work condemned by the Architect as failing to conform to the contract, whether incorporated or not, and said Contractor shall promptly replace and reexecute his own work in accordance with the contract and without expense to the Owner and shall bear the expense of making good all work of other Contractors destroyed or damaged by such removal or replacement."

As we view these provisions, moneys are not "due and payable" under the written contract until an architect's certificate has been obtained (or a judgment is entered by a court).

In the case at bar, the supervising architect had refused to issue his final certificate, a condition precedent to the payment of the remaining balance of the sums claimed by Corbetta under the contract for general construction and the contract for lathing and plastering. As of that date, the Hospital's walls were still covered with Textolite wall paneling (which had a flame spread rating some 17 times that permitted under the Chicago Building Code), the city was refusing to issue an occupancy permit and was threatening to shut down the Hospital's operation, etc., and the refusal to issue the certificate was neither arbitrary nor collusive. Nor was unreasonable delay involved.

A relatively recent Illinois decision on this point is *Watson Lumber Co. v. Guennewig* (1967), 79 Ill.App.2d 377, 226 N.E.2d 270, where, in reversing a judgment awarding interest under a written building contract and remanding the case for a new trial in which (p. 400) "Interest should not be found on what is found to be due," the Appellate Court for the Fifth District, at page 398, said:

"The interest awarded as part of the judgment which the trial judge describes as 5% interest on the contract balance for 2 years, that being the period since the last payment, seems to us to be without foundation in our interest statute, and the cases construing it. C 74, Ill Rev Stats 1965, § 2. This statute, by its terms, limits the award of interest on contracts for money that is due. Booher v. Williams, supra. Interest is not awarded on money that may be found due, if the person withholding payment has done so in good faith, because of a genuine and reasonable dispute. In

other words, interest would be a proper element of recovery only if it could be said relationship of debtor and creditor existed between the parties. *Mariner v. Gilchrist,* 280 Ill 544, 117 NE 695. Interest can be awarded on money payable under building contracts, even when the amount payable may be uncertain until legally resolved; *In re Morrison,* 261 F 355, *Downey v. O'Donnell,* 92 Ill 559, but it has been held error to allow interest on an amount due when, as here, that amount depends largely upon the construction placed on the terms of a contract, and upon questions of fact about which there is room for a difference of opinion. *O'Heron v. American Bridge Co. of New York,* 177 Ill.App. 405. The dispute here was genuine, substantial, and we believe in good faith on the part of both parties; there was nothing unreasonable or vexatious about the defendant's delay in paying. \* \* \*"

■■ We therefore conclude and hold that interest should not begin to run on the sums so withheld until the trial court, on remand, has fixed the amount improperly withheld and has entered judgment therefore in favor of Corbetta and against the Hospital.

Inasmuch as the trial court directed a verdict for the Hospital and against Corbetta on the latter's counterclaim for the sums so withheld and entered judgment thereon, we reverse so much of the judgment as did so and remand the case for such further proceedings as are above indicated.

## VIII.

This brings us to what we perceive to be the *eighth* problem— Whether, in No. 56761, the trial court erred in dismissing General Electric's separate suit (here consolidated) against Corbetta for the price of the Textolite originally installed and later removed and replaced with Micarta paneling which met the flame spread requirements of the Chicago Building Code?

Inasmuch as we have heretofore (*supra,* IV (c)) held that General Electric was guilty of fraud and deceit in not disclosing to the other parties that its said paneling had actually been tested by Underwriters Laboratory and had been found to have a flame spread some 17 times the maximum under the Chicago Building Code, it is obvious that it cannot recover the price of its said Textolite paneling and that the trial court properly dismissed its said action.

## IX.

We now pass briefly to what might be a *ninth* problem—The propriety of the instructions given the juries in the two trials relating to liability and damages.

We have considered the objections made but are of the considered opinion that, by affirming in part and reversing in part and remanding the case to the trial court for considerably limited further proceedings (hopefully not requiring another jury), all of such objections are now moot and we do not further consider them.

## X.

### Recapitulation

### (*Or Putting It All Together*)

■■ During the oral arguments in this case it was pointed out that the situation here involved occurred some 7 years ago, that this case was tried before an able and experienced trial judge and two juries for a total of 6½ weeks by five firms of able and experienced (and expensive) counsel, that hundreds of documentary exhibits are involved and a transcript of over 5000 pages; and the hope was expressed that this court on this appeal could somehow dispose of the matter without another full-scale jury trial, with further attorneys' fees and expenses, transcripts, etc. We have not been unmindful of these considerations.

Putting together all of the conclusions above set forth at considerable length, we take the following actions.

In No. 56761, we affirm the judgment dismissing General Electric's separate action against Corbetta for the price of the Textolite wall paneling originally installed on the walls of the hospital and later removed and replaced with Micarta wall paneling complying with the Building Code.

In No. 56452, we affirm the judgment of some $17,178.31 in favor of the Hospital against Belli for the expenses of the restoration of "pipe spaces," etc., under Count II of the complaint. We also affirm the dismissal of all counterclaims seeking indemnity as between the defendants and approve the trial court's actions in permitting the instant suit to proceed as one for declaratory judgment and in separating the issues of liabilities and damages, with a separate jury for each.

We reverse the trial court's dismissal of Corbetta's counterclaim against the Hospital for the sums withheld by it under the general construction and plastering and lathing contracts and remand the case for the entry of a judgment in favor of Corbetta and against the Hospital, without interest, for $453,361.55, unless it shall appear that said holdback includes the price of the Textolite wall paneling originally installed and later removed, which, we have held, need not be paid by Corbetta to General Electric. If it does, this sum should be deducted from the $453,361.55.

We also reverse the judgments below insofar as the Hospital recovered attorneys' fees and expenses from Corbetta and insofar as Corbetta re-

covered from Belli and General Electric (so as to divide the damages, roughly one-third to each). We also set aside the jury's verdict that Corbetta is liable to the Hospital, reduce the damages fixed by the jury from $319,519.34 to $203,035.34 and remand the case for the entry of a judgment in favor of the Hospital against Belli and General Electric in that reduced sum; and another judgment in favor of the Hospital against General Electric for attorneys' fees and expenses in the sum of $112,-251.21.

No party to recover costs on this appeal.

No. 56452. Affirmed in part, reversed in part and remanded with directions.

No. 56761. Affirmed.

BURKE and GOLDBERG, JJ., concur.